In re MIDLAND UNITED CO.

No. 1073.

District Court, D. Delaware.

Dec. 11, 1944.

Clarence A. Southerland, of Wilmington, Del., Successor Trustee of Estate of Midland Utilities.

Lloyd F. Thanhouser, of New York City, for trustee of Midland Utilities.

Hugh M. Morris, of Wilmington, Del., Trustee of Estate of Midland United Co.

Max Swiren and Ben. W. Heineman, both of Chicago, Ill., for Hugh M. Morris, Trustee of Midland United.

Albert W. James, of Wilmington, Del. (Frank D. Mayer and Donald M. Graham (of Mayer, Meyer, Austrian & Platt), all of Chicago, Ill., of counsel), for Continental Illinois Nat. Bank & Trust Co., of Chicago.

Robert N. Golding, of Chicago, Ill., for Middle West Corporation.

James R. Morford, of Wilmington, Del. (Clarence U. Carruth, Jr. (of Curtis, Mallet-Prevost, Colt & Mosle), all of New York City, of counsel), for Prior Lien Stockholders Committee of Midland Utilities Co.

Francis L. Daily and Joseph H. Mueller (of Daily, Dines, White & Fiedler), all of Chicago, Ill., for Peoples Gas Light & Coke Co., and Peoples Gas Light & Coke Co. Service Annuity Trust.

Lee A. Freeman, of Chicago, Ill., for Commonwealth Subsidiary Corporation and Public Service Co. of Northern Illinois.

Harold Evans, of Philadelphia, Penn., for Philadelphia Committee of Debenture Holders.

David S. Keil, of Wilmington, Del., and Jason L. Honigman, of Detroit, Mich., for Daniel A. Gilbert and others, prior lien stockholders.

Leonard B. Ettelson, of Chicago, Ill., for Debenture Holders' Committee of Midland Utilities Co.

Howard Duane, of Wilmington, Del., and Jacob I. Grossman, of Chicago, Ill., and Cornelius C. O'Brien, of Philadelphia, Penn., for intervener Debenture Holders.

Robert LeRoy (of Cadwalader, Wickersham & Taft), of New York City, for Midland United Preferred Stockholders Committee.

Morton E. Yohalem, of Philadelphia, Penn., for the S. E. C.

William Prickett, of Wilmington, Del., and Carl Painter, of New York City, for Emerich Committee of Debenture Holders of Midland Utilities.

BIGGS, Circuit Judge.

It is my duty to determine whether a plan of reorganization [1] for Midland United Company (United) and Midland Utilities Company (Utilities), two Delaware corporations and registered holding companies, jointly proposed by their trustees, meets the requirements of Section 174 of the Bankruptcy Act, 11 U.S.C.A. § 574. This court obtained jurisdiction of both corporations pursuant to the provisions of Section 77B of the Bankruptcy Act, 11 U.S.C.A. § 207. The plan of reorganization was submitted on November 9, 1943 by the trustees to the Securities and Exchange Commission as required by the Public Utility Holding Company Act of 1935 and has been approved, with certain modifications, by the Commission as conforming with the requirements of Section 11 (f) of that Act, 15 U.S.C.A. § 79k (f). Full opportunity was afforded by the Commission to all parties in interest in these proceedings and to all creditors, security holders and stockholders of the debtors, to appear before it and be heard. After protracted hearings and extensive argument the Commission found the plan, as modified, to be "fair and equitable, and feasible".

Thereafter, on notice as required by law, a hearing was had in this court. Certain evidence, referred to more particularly hereinafter, was received. More than fifteen groups of interested persons appeared by their respective counsel at the hearing on the plan before this court. These included secured creditors of both debtors, subsidiary and other corporations, committees representing preferred stockholders of United, debenture holders and prior lien stockholders of Utilities and certain nonintervening debenture holders and prior lien stockholders of Utilities. With the exception of two comparatively small groups of debenture holders and prior lien stockholders of Utilities, all in interest have united to urge upon the court the great desirability, even the prime necessity, of the approval of the plan of reorganization as modified. The objecting groups assert by way of what may be described as a general objection [2] to the plan that Utilities was subjected by United, the holder of all of the common stock of Utilities, to a course of conduct like unto that condemned by the Supreme Court in Taylor v. Standard Gas & Electric Co., 306 U.S. 307, 59 S.Ct. 543, 83 L.Ed. 669, and that the claims of creditors and security holders of United must be subordinated in access to assets in the reorganization to the claims of creditors and prior lien stockholders of Utilities; that, therefore, the considerations which Utilities debenture holders and prior lien stockholders will receive are so insufficient as to render the plan of reorganization unfair as to them. This raises the substantial issue to which this opinion must be directed for, if the plan merits approval, it must be fair and equitable to every claimant and meet the test laid down by Section 174. In order to determine whether the plan as modified pursuant to the Commis-

---

[1] The plan sub judice represents no less than the fifth attempt made by one or more of the trustees or parties in interest to compromise some, or all, of the claims discussed in this opinion or to reorganize one or both of the debtors.

[2] Specific objections made by these two groups will be discussed at a later point in this opinion.

sion's direction is fair and equitable, and feasible, it is necessary to state facts relating to claims against and by the debtors, their outstanding securities, their assets, and the litigation with which this court has been concerned for the past decade. The important aspects of the plan also must be explained and discussed. All of this is gone into at great length in the findings and opinions of the Commission and there is no necessity to restate all here. Reference is made to the Commission's findings and opinions.[3]

United owns all of the common stock of Utilities. The interests of the debtors in subsidiaries and the extent of those interests as of December 31, 1943 are set out below.[4] The outstanding securities and stocks of the debtors also are stated in the margin.[5] The claims against United excluding the

[3] Preliminary findings and an opinion of the Commission preceded its "Definitive Findings and Opinion". For the latter see Holding Company Act, release No. 5317A, S. E. C.

[4] Midland United Company
* 100% Indiana Hydro-Electric Power Company
 100% Midland Stock Transfer Company
 100% M. U. Securities Corporation
 39% Public Service Company of Indiana, Inc.
 100% South Construction Company, Inc.
 50% White River Corporation
 100% Union City Electric Company
 100% Midland Utilities Company
 ** 79.9% Chicago, South Shore and South Bend Railroad (Ind.)
 100% Chicago, South Shore and South Bend Railroad (Mich.)
 100% Indiana and Kensington Railroad Company
 100% Michigan City Terminal, Incorporated
 94.9% Indiana Service Corporation
 98.8% Northern Indiana Public Service Company
 100% Berrien Gas and Electric Company
 100% Shore Line Shops, Incorporated
 100% Utilities Building, Incorporated
 100% Public Service Pipe Line Company

* Indiana Hydro-Electric Power Company was merged with Northern Indiana Public Service Company pursuant to a plan filed under Section 11(e) of the Public Utility Holding Company Act of 1935 and approved by the Commission on May 6, 1944. Indiana Hydro-Electric Power Company, et al., — S. E. C. — (1944), Holding Company Act Release No. 5027.

** The interest of the Utilities estate in Chicago, South Shore and South Bend Railroad (Ind.) was sold by the Utilities trustees pursuant to authority granted by the court on June 3, 1944, for the sum of $2,687,718.12.

[5] AMOUNTS WITH INTEREST AND ARREARAGES OF DIVIDENDS TO SEPTEMBER 30, 1944.

| Issue | | |
|---|---|---|
| *United* | | |
| Demand Notes (Secured) | | |
| Commonwealth Edison | $ 4,741,130 | |
| Peoples Gas | 3,764,288 | |
| Public Service Illinois | 1,615,450 | |
| | | $10,120,868 |
| $6 Cum. Pfd. Stk., no par, 144,093 shares— | | |
| Liquidation Preference | $14,409,300 | |
| $3 Cum. Pfd. Stk., no par, 206,921 shares— | | |
| Liquidation Preference | 10,346,050 | |
| | $24,756,350 | |
| Dividend Arrearages | 18,689,289 | |
| | | $43,445,639 |
| Common Stock, no par, 2,748,645 Shares, stated capital | | $27,486,450 |

claims of Utilities are set out in the footnote.[6] The claims against Utilities exclud-

*Utilities*

| | | |
|---|---:|---:|
| Demand Notes (Secured) | | |
| Continental Bank | $ 3,670,575 | |
| Peoples Gas Service Annuity Trust | 1,844,704 | |
| Demand Notes (Unsecured) | | |
| United | 18,640,265 | |
| Northern Indiana | 1,213,627 | |
| Peoples Gas | 29,017 | |
| | | $25,398,188 |
| 6% Debentures due 1938 | $ 6,000,000 | |
| Interest to 9/30/44 | 3,810,000 | |
| | | $ 9,810,000 |
| Cum. Prior Lien Stk., 6%, Par $100, 89,050 shares | $ 8,905,000 | |
| Cum. Prior Lien Stk., 7% Par $100, 121,585 shares | 12,158,500 | |
| | $21,063,500 | |
| Dividend Arrearages | 17,217,438 | |
| | | $38,380,938 |
| Cum. Pfd. Stk., 6%, Par $100 | $ 3,522,300 | |
| Cum. Pfd. Stk., 7%, Par $100 | 14,340,100 | |
| | $17,862,400 | |
| Dividend Arrearages | 15,138,638 | |
| | | $33,001,038 |
| Common Stock, no par, 378,300 shares, stated capital | | $ 3,783,000 |

### [6] CLAIMS AGAINST UNITED (Excluding Claims of Utilities)

| | Principal Amounts of Claims at June 9, 1934 | Subsequent Approved Credits to Principal | Balance of Principal Amounts | Balance of Principal Amounts Plus Interest to September 30, 1944 |
|---|---:|---:|---:|---:|
| **SECURED CLAIMS:** | | | | |
| Commonwealth Edison Company | $3,106,002.23 | $ 38,983.95 | $3,067,018.28 | $ 4,741,332.63 |
| The Peoples Gas Light and Coke Company | 2,460,990.74 | 26,096.68 | 2,434,894.06 | 3,764,287.79 |
| Public Service Company of Northern Illinois | 1,058,294.23 | 13,316.83 | 1,044,977.40 | 1,615,450.08 |
| Total Secured Claims | $6,625,287.20 | $ 78,397.46 | $6,546,889.74 | $10,121,070.50 |
| **ALLOWED CLAIMS:** | | | | |
| Northern Indiana Public Service Company | $ 22,522.63 | $ ...... | $ 22,522.63 | $ 22,522.63 |
| The Peoples Gas Light and Coke Company | 9,527.53 | ...... | 9,527.53 | 9,527.53 |
| Estate of George Roehm | 43.00 | ...... | 43.00 | 43.00 |
| Total Allowed Claims | $ 32,093.16 | $ ...... | $ 32,093.16 | $ 32,093.16 |
| **OTHER CLAIMS:** | | | | |
| Henry Van Aalderen | $ 85,000.00 | $ ...... | $ 85,000.00 | $ 85,000.00 |
| Total Primary Claims | $6,742,380.36 | $ 78,397.46 | $6,663,982.90 | $10,238,163.66 |
| **CONTINGENT CLAIMS:** | | | | |
| Continental Illinois National Bank and Trust Company of Chicago | $2,500,000.00 | $140,000.00 | $2,360.000.00 | $ 3,670,574.75 |
| The Peoples Gas Light and Coke Company Service Annuity Trust | 1,111,370.00 | 28,996.32 | 1,082,373.68 | 1,777,055.77 |
| Total Contingent Claims | $3,611,370.00 | $168,996.32 | $3,442,373.68 | $ 5,447,630.52 |

,ing those of United are stated in the next footnote.[7] Discussion will be required in respect to the treatment of stocks in certain subsidiaries of the debtors under the plan. I conclude that the values put upon the physical assets of the debtors by the Commission are substantially correct. In my opinion, however, the fairness of the plan turns only partially upon the correctness of the Commission's appraisal of physical assets, conceded even by the objectors (with the exception of the value put upon Northern Indiana common stock) to be correct, but depends in large part upon

[7] CLAIMS AGAINST UTILITIES (Excluding Claims of United)

| | Principal Amounts of Claims at June 9, 1934 | Principal Amounts Plus Interest to September 30, 1944 |
|---|---|---|
| SECURED CLAIMS: | | |
| Continental Illinois National Bank and Trust Company of Chicago | $ 2,360,000.00 | $ 3,670,574.75 |
| The Peoples Gas Light and Coke Company Service Annuity Trust | 1,082,373.68 | 1,777,055.77 |
| Total Secured Claims | $ 3,442,373.68 | $ 5,447,630.52 |
| DEBENTURE CLAIMS: | | |
| Debenture Holders | $ 6,000,000.00 | $ 9,810,000.00 |
| ALLOWED CLAIMS: | | |
| Northern Indiana Public Service Company (Notes) | $ 668,966.06 | $ 1,201,919.78 |
| Gary Electric and Gas Company | 352,000.00 | 592,214.34 |
| Trustees of Midland United Service Annuity Fund | 69,500.00 | 117,281.31 |
| Insurance Trustees—Casualty Group | 47,943.75 | 80,538.87 |
| The Peoples Gas Light and Coke Company (Unsecured Note) | 17,510.00 | 29,016.98 |
| Shore Line Shops, Inc. | 7,500.00 | 12,356.25 |
| Berrien Gas and Electric Company | 1,725.00 | 2,841.94 |
| Michigan City Terminal, Inc. | 1,500.00 | 2,463.50 |
| Chicago South Shore and South Bend Railroad | 572.22 | 572.22 |
| Midland Stock Transfer Company | 260.07 | 260.07 |
| Public Service Company of Indiana, Inc. | 179.78 | 179.78 |
| Lincoln Printing Company | 162.60 | 162.60 |
| Arthur Andersen & Company | 125.00 | 125.00 |
| Corporation Trust Company | 42.30 | 42.30 |
| Nelson-Eisman Company | 13.22 | 13.22 |
| Receivers—Chicago Rapid Transit Co. | 1.45 | 1.45 |
| Total Allowed Claims | $ 1,168,001.45 | $ 2,039,989.61 |
| OTHER CLAIMS: | | |
| Northern Indiana Public Service Company (Contract) | $ 2,900,000.00 | $ 2,900,000.00 |
| H. L. Leilich | 9,840.00 | 9,840.00 |
| Total Other Claims | $ 2,909,840.00 | $ 2,909,840.00 |
| Total Primary Claims | $13,520,215.13 | $20,207,460.13 |
| CONTINGENT CLAIMS: | | |
| Commonwealth Edison Company | $ 1,851,860.00 | $ 2,985,878.70 |
| The Peoples Gas Light and Coke Company | 1,411,060.00 | 2,275,110.95 |
| Public Service Company of Northern Illinois | 657,080.00 | 1,059,456.38 |
| Total Contingent Claims | $ 3,920,000.00 | $ 6,320,446.03 |

674

the respective rights, obligations and standing of the parties to the litigations now pending in this court.

I shall not undertake to discuss or even to name all of the claims or litigations but will deal only with those which may be deemed to have a substantial bearing on the question of the fairness of the plan. The first group of litigations concerns claims asserted by United against Utilities and by Utilties against United. The second, claims asserted by those utility companies generally referred to in these proceedings as the "Chicago Operating Companies" (Commonwealth Edison Company, The Peoples Gas Light and Coke Company and Public Service Company of Northern Illinois) and by The Peoples Gas Light and Coke Company Service Annuity Trust, as secured creditors. A third litigation arises because certain sums were advanced by Continental Illinois National Bank and Trust Company on a note of Utilities guaranteed by United and later secured by collateral. Both United and Utilities assert a counterclaim. A fourth litigation lies in a claim by Utilities debenture holders against Continental Bank and other secured creditors, including the Chicago Operating Companies, arising from the alleged breach of the negative pledge covenant of the debenture agreement. A fifth litigation arises by reason of a claim by Middle West Utilities (supported by its successor, Middle West Corporation) to 112,293 shares of the $6 preferred stock of United, constituting 45% of United's outstanding preferred stock. The United trustee, by way of counter-claim, charges that Middle West, United's largest single stockholder, participated in transactions harmful to United. The claims of the creditors referred to in the second and third groups of litigations and the claims of the trustees against these creditors have been made the subject of a separate settlement agreement which is none the less an essential part of the plan of reorganization. This agreement will be discussed hereinafter.

The intercompany litigations are the most important and since the fairness of the plan largely turns upon the disposition of them and the standing of the parties in relation to them they are set out below as summarized by the Commission.[8] The claims asserted by United's trustee against Utilities total approximately $25,000,000. Those asserted by Utilities trustees against United amount to about $73,500,000. All the claims have been excepted to by the trustees of the respective estates. Utilities contends that United misappropriated or diverted from its treasury securities having a book value of approximately $48,750,000; that United caused Utilities illegally to pay dividends to United in the sum of $1,848,000; that United compelled Utilities to purchase Gary Heat, Light & Water Company from it at an excessive price, viz., for approximately $18,000,000. These are some of the transactions involved in Utilities' claim against United. United's claim

---

[8] The claims by United against Utilities are in the total amount of $24,943,173.11, based on the following items:

| | | | |
|---|---|---|---|
| 1. | Unsecured notes of Utilities, issued after April 1931, held by United | $7,627,213.17 | |
| | Interest thereon to date of the institution of the 77B proceedings (6/9/34) | 761,414.06 | |
| | Open account | 50,757.17 | |
| | | $8,439,384.40 | |
| | Secured notes of Utilities pledged by United with the Chicago Operating Companies | 3,920,000.00 | |
| | Interest thereon to 6/9/34 | 380,012.72 | |
| | | $4,300,012.72 | |
| | Total claim | | $12,739,397.12 |
| 2. | United securities pledged as collateral for Utilities' note of $1,111,370 payable to the Peoples Gas Light and Coke Company Service Annuity Trust (Service Annuity Trust) | | 1,502,552.07 |
| 3. | Contingent liability arising out of endorsement by United of Utilities' notes issued to Continental Illinois National Bank and Trust Company of Chicago (Continental Bank) and Service Annuity Trust | | 3,726,348.68 |
| 4. | Counterclaim based upon use of United's property and credit for Utilities' benefit | | 6,974,875.24 |
| | Total claims | | $24,943,173.11 |

against Utilities rests in part upon losses allegedly sustained by United because of the use of its property and credit for Utilities' benefit, the loss being asserted to be approximately $7,000,000. United also claims that Utilities owes it approximately $4,300,000 by reason of advances plus interest secured by United from the Chicago Operating Companies and advanced by United to Utilities. United also asserts a claim for contingent liability arising out of endorsement by United of Utilities' notes issued to Continental Bank. To discuss these claims and cross-claims fully would require many pages of an opinion. I shall not embark on such a course.

Utilities' trustee, citing Taylor v. Standard Gas & Electric Co., supra, and relying in part on the fact that United owned all of Utilities' common stock and, therefore, at least technically, was in a position to dominate it, assert that the creditors and stockholders whom they represent are entitled to a subordination of United's creditors. United, not to be outdone, asserts that the principle of the Taylor case should be applied for its benefit because it was dominated by the Chicago Operating Companies and by Utilities. United's trustee in fact contends that the Chicago Operating Companies caused the incorporation [9] of United, owned a controlling interest in it and compelled it to use its assets, credit and property for the benefit of Utilities. It should be stated that all the important litigations which involve these debtors turn, in their essential elements, on the application of the principle set out in the Taylor decision.

All claims and counterclaims with the exceptions and objections filed thereto were referred by the court to a special master. Hearings on the claims and objections began before him in July, 1940. The master took the evidence of many witnesses and received some hundreds of exhibits. The master filed his final report on the intercompany claims and litigations on February 26, 1943. He had been directed by the court not to file any report in respect to any of the other claims or litigations until ordered to do so. It is unnecessary to discuss at this point of this opinion the nature of the master's findings and conclusions. It is sufficient to state that the assertion of right to subordination by the Utilities' trustees for the benefit of their estate was not sustained.

Exceptions were filed to the report and argument was had before the court. Following this, the present writer examined the record and the briefs in preparation for the writing of an opinion. He was then informed by the trustees that a plan of settlement, which might dispose of most if not all of the claims and litigations, had been agreed to tentatively by the trustees and by most of the committees representing security holders and stockholders. The trustees were informed by the court that in view

The claims filed by the Utilities trustees against the United estate are as follows:

1. Alleged indebtedness based upon:

| | |
|---|---|
| a. The acquisition by Utilities of Gary Heat, Light & Water Company (Gary Heat) from United | $18,049,478.40 |
| b. The acquisition by Utilities of Hobart Light and Water Company (Hobart) from United | 539,244.71 |
| c. The acquisition by Utilities of United's interest in Calumet Railways Company (Calumet) | 342,116.32 |
| d. The alleged conversion by United and I. U. I. of securities of Utilities | 1,422,193.03 |
| e. Alleged losses suffered by Utilities in the Intercompany Syndicate | 2,280,792.48 |
| f. The alleged unlawful payment of dividends by Utilities to United in 1931 | 1,848,420.64 |
| g. The exchange by Utilities of its note for a note of Utility Securities Company held by Northern Indiana | 674,947.50 |
| Total | $25,159,193.08 |
| Less set-off allowed | 251,930.18 |
| Net claim | $24,807,262.90 |
| 2. Book value of Utilities' securities allegedly misappropriated or diverted by United | 48,742,703.05 |
| Total claims | $73,549,965.95 |

[9] The "parent", United, in fact came into existence after the child, Utilities. Utilities was incorporated on June 11, 1923; United, on December 26, 1928.

of that fact no adjudication of the questions presented by the exceptions to the master's report would presently be made. On May 16, 1944, a procedural memorandum was filed stating that adjudication of the intercompany litigations would militate against, if not destroy, the possibility of a reorganization of the debtors based upon compromise and that no adjudication of the pending controversies would presently be made for that reason. At that time the plan of reorganization was before the Commission for consideration. It was obvious then, as it is obvious now, that if a fair compromise of the very numerous litigations could be arrived at and a plan of reorganization worked out, the result would redound to the benefit of the creditors, security holders and stockholders of the debtors.

My reasons for reaching this conclusion are as follows. The application of the doctrine of Taylor v. Standard Gas & Electric Co. presents great difficulty under the circumstances of the litigations at bar. The decision as to whether the trustees of United or Utilities are entitled to avail themselves of the subordination doctrine for the benefit of their respective estates depends on facts so multifarious and complex that their interpretation in legal effect must differ with the accent put upon them. Those objecting to the plan take the position that there can be no doubt that Utilities is entitled to subordination and that the circumstances prove this clearly. In my opinion the assertion of such views is naive if ingenuous. The staff of the Securities and Exchange Commission in a carefully documented memorandum filed with the master reached conclusions as to subordination which favored Utilities. The master, however, after a careful consideration of the facts and their legal consequences reached very different conclusions. The great difficulty in applying the doctrine of the Taylor decision under the circumstances relating to the intercompany transactions is apparent from the record taken by the master. The fact is that Samuel Insull, Sr. treated United and Utilities and their subsidiary companies as if they were enterprises owned solely by himself. He did what he wanted with them. He demonstrated a large contempt for corporate fictions and the niceties of corporate management. This contempt, quite apparent in the record from the time of United's organization, became startlingly clear as soon as the holding companies' enterprises dominated by him met financial difficulties. The date of Insull's loss of control of his utilities empire was no earlier than May, 1932, though earlier critical dates may be asserted.

The purchase of Gary Heat, Light and Water Company will serve as an example. This company was purchased by United from United States Steel Corporation for approximately $23,000,000. There is evidence that this was an excessive price. Gary Heat was then taken over by Utilities which undertook to reimburse United for it and borrowed $2,500,000 from Continental Bank for that purpose. This loan plus interest, less certain credits, represents the secured claim of the bank. It is evidenced by a note of Utilties guaranteed by United, hereinbefore referred to. The note is secured by collateral belonging to United and Utilities. There are cogent reasons for concluding that the stock of Gary Heat at all times belonged in Utilities' portfolio rather than in that of United. Utilities' trustees insist that United caused Utilities to pay for Gary Heat and acquire its securities because United desired relief from the burden of an excessive price. United's trustee contends that even if the price was excessive the purchase was made in reality by Utilities. The truth is that Samuel Insull desired to acquire the control of Gary Heat. He effectuated that purpose, using United as the medium of the purchase for the reason that the Steel Company would not accept Utilities as a debtor. Insull then caused Utilities to take over the purchase, whatever its burdens or its benefits. The principle of the Taylor case might or might not be applicable under the circumstances, but its application would embrace the surety that litigation would not end in this court.

As a further example, consider certain aspects of the claim of Continental Bank. The bank advanced substantial sums of money to both Utilities and United. Samuel Insull, Jr. was president of both companies. The sums advanced to United were repaid. After a demand for further collateral, securities were "borrowed" by Insull Utilities Investments, Incorporated, and were pledged with the bank as collateral. Were the securities taken from Utilities by United without authority? If so, did the bank know this? The stocks were in the name of a nominee. The Utilities trustees insist that the bank had knowledge that the collateral had been in fact converted from Utilities. The bank contends that it had no

such knowledge and that it acted in good faith. But again what is in reality a question of subordination arises. Samuel Insull, Jr., acting for his father through the instrumentality of the Investment Company, took the securities to which Utilities asserts it is entitled and pledged them. The Investment Company was operated by the Insulls as they saw fit. The determination of questions of subordination under such circumstances is difficult. The adjudication depends on a most complex series of facts. The defeated litigants, whoever they happened to be, would scarcely be satisfied with the judgment of this court. An appeal or a series of appeals would surely follow. Interminable litigation would ensue.

If the examples which have been given constituted all, or even a large part of the most troublesome litigations, solutions by way of compromise might not be so desirable. But the instances referred to present only a small segment of the whole litigious picture. Almost all of Utilities' suits against United present the same difficult question of subordination, as do some of United's litigations against Utilities. There are in fact few important litigations which are free from the assertion by one claimant or another that the application of the principle of the Taylor case is necessary and appropriate. Any decision must turn on a question of law so acutely nice as to render reorganization or liquidation of the debtors impossible until the appeals to higher tribunals have been exhausted. If all the questions presented were to proceed to final adjudication and the debtors then be liquidated, the time required might not be encompassed within the coming decade. Each large litigation is entangled with every other. More than ten years have passed since United and Utilities came into this court. In that period nothing has been paid to public investors. It is impossible to conceive of any valid reason why litigation should proceed if the plan of reorganization is fair and equitable.

The plan of reorganization will dispose of every issue raised in the cases. It is based on careful valuations of the respective assets of United and Utilities. These inventories were made as of September 30, 1944. They are set out in detail in the Commission's definitive findings of fact and opinion. The claims, allowed and disputed, filed against both debtors are discussed in full in the Commission's reports. The intercompany litigations are fully described and possible solutions are canvassed. The plan of reorganization is discussed in great detail and weighed with care. It is obvious that the Commission had sound reasons for concluding that the plan is fair and equitable, and feasible.

The plan contemplates the speedy liquidation of both debtors, if possible within five years. Under the plan Utilities will be recapitalized so that there will be issued and outstanding 1,500,000 shares of common stock of $1 par value. Of these shares, 40% or 600,000 will be issued to the debenture holders of Utilities. 60% or 900,000 shares will be issued to United. United will change its name to Midland Realization Company. Its charter will be amended so that it may issue approximately 620,000 shares of common stock at $1 per share. The disposition of these stocks will be dealt with at a later point in this opinion. The plan, as modified by the Commission, provides also that within one year after the effective date of the plan, the date of confirmation by the court, or within ninety days after the obligations of Realization Company to the secured creditors have been reduced to $1,500,000 or less, whichever occurs sooner, Realization Company and Utilities shall present a plan of merger to the Commission, which shall be fair and equitable and shall comply with the requirements of the Holding Company Act. The plan contemplates that this court shall retain jurisdiction to require the companies to consummate the plan of merger.

On consummation of the settlement, the collateral now held by the secured creditors will be surrendered immediately and these creditors will receive payments in cash and obligations as set out in the table in the footnote.[10] It should be noted, however, that interest on the obligations at the

| 10 Secured Creditors | Cash | Obligations | Settlement Totals |
|---|---|---|---|
| Continental Bank | $2,630,000.00 | $ 270,000.00 | $2,900,000.00 |
| Service Annuity Trust | 1,206,373.68 | 124,000.00 | 1,330,373.68 |
| Commonwealth Edison | 703,408.55 | 702,000.00 | 1,405,408.55 |
| Peoples Gas | 558,748.47 | 557,000.00 | 1,115,748.47 |
| Public Service Illinois | 239,842.98 | 239,000.00 | 478,842.98 |
| | $5,338,373.68 | $1,892,000.00 | $7,230,373.68 |

stipulated rate of 2% per annum from July 1, 1943, (save on the obligations given to Continental Bank and Service Annuity Trust which bear no interest) will be waived to the end of 1944, if the plan be consummated. The obligations due the Chicago Operating Companies are to be paid by Realization Company as cash becomes available in accordance with a schedule of priorities specified in the settlement agreement.

■ Brief reference will be made to the treatment to be accorded to some of the secured creditors. Continental Bank will relinquish between 29% and 33% of what it claims. The bank, if successful in all its contentions, would be entitled to payment in full; if, unsuccessful, its claim would be subject to drastic reduction. United, for example, might make good its assertion that its guarantee of the note given to the bank by Utilities was ultra vires. On the other hand, the court might hold that Utilities' assertion that it was compelled to execute the note through United's domination was sound. The counterclaim possesses undoubted strength, but the result of the entire litigation is uncertain and its final determination would require many months. The bank, moreover, has relinquished any right under the plan to receive stock of Realization Company worth about $400,000. On consideration of all the circumstances, I conclude that the compromise of the bank's claim is fair and equitable.

■ Service Annuity Trust will receive approximately 75% of its claim, if the plan be consummated. It would receive less than full payment if United were able to sustain its contention that its endorsement of Utilities' note to Service Annuity Trust was ultra vires. To adjudicate that issue would require an exact ascertainment of the influence exerted by Insull in the affairs of United, Utilities and their subsidiaries. The legal effect of Insull's relationship to his companies is peculiarly difficult to determine because of the maze of corporate entities through which he and his associates worked. But Service Annuity Trust's position is not a weak one. I conclude as did the Commission that this creditor has made a substantial sacrifice in aid of the plan.

The settlements to be made with secured and other claimants and litigants seem to me to lie well within the range of fairness. I shall discuss other compromises, settlements and participations under the plan as will appear.

Realization Company will distribute the common stock of Public Service Company of Indiana, owned by it, together with dividends on the stock in excess of 25¢ per share paid after December 31, 1943 to United's preferred stockholders at the rate of one share for each share of the $3 preferred stock of United and two shares for each share of the $6 preferred stock of United. Since there is not a sufficient number of shares fully to carry out this distribution, some of United's preferred stockholders will receive cash instead of stock. Such payments are to be made in accordance with the formula stated in the plan. Realization Company will pay the unsecured creditors of Utilities whose claims have been allowed amounts totalling $32,093.16. The Van Aalderen claim, presently asserted in the sum of $85,000, will be compromised by Utilities by the payment of $6,000. Realization Company also will pay other unsecured creditors of Utilities sums totalling $355,336.53. Northern Indiana Public Service Company will receive $200,000 of this amount. Members of the public owning 27,155 shares of Northern Indiana common stock will receive 52¢ in cash for each share held by them. Utilities also will pay from the sum of $355,336.53 the outstanding obligations of Gary Electric and Gas Company, an inactive subsidiary of Utilities. These payments will total $28,000. The owners of the publicly held shares of Gary Electric common stock will receive 89¢ per share from Utilities. There are 35,587 shares outstanding. Claims now allowed against Utilities in amounts under $500 will be paid in full. Claims in amounts over $500 will be paid at the rate of 50¢ a dollar as allowed. The Leilich claim, asserted in the amount of $9,840, will be settled by the payment by Utilities of $2,000.

Utilities' debenture holders will receive 600,000 shares of Utilities' new stock with a value of from $5,734,000 to $7,415,000 and 123,600 shares of Realization Company stock possessing a value from $930,000 to $1,434,000. The aggregate value lies between $6,660,000 and $8,840,000. Utilities' prior lien stockholders are to receive 103,985 shares of Realization Company stock possessing a value of from $782,800 to $1,206,000. United's preferred stockholders will receive 391,122 shares of Realization Company stock having a value between

$2,944,000 and $4,537,000, and 495,100 shares of the common stock of Public Service Company of Indiana, Inc. with an estimated value of $9,097,000.

All the suggested participations are deemed to be fair and equitable by all save the present objectors. I shall discuss some, but by no means all, of the considerations involved. It will be borne in mind that that which would be received by the security holders and stockholders of the debtors upon litigation of the many and diverse conflicting claims is a subject of speculation. For example, if the Utilities trustees were successful in the intercompany litigations, the bulk of the assets of both estates would fall into the hands of the Utilities trustees. If, on the other hand, the United trustee was successful the Utilities estate would be diminished very greatly.

The value of Utilities' debentures would be affected both by the determination of the intercompany claims and the outcome of the negative pledge litigation. The debenture holders would receive a larger portion of their claims if either the intercompany litigation or the negative pledge litigation terminated in their favor. But if it should transpire that United's claim against Utilities, as allowed by the master, is sustained by the court and the claims of the Chicago Operating Companies are allowed in full, Utilities also being held liable to United for the sums advanced by the Chicago Operating Companies to United and readvanced by United to Utilities, Utilities' debenture holders could receive as little as 25¢ on the dollar of their claims. If the claims of the Chicago Operating Companies were subordinated in favor of the Utilities' estate and Utilities was held to have taken over Gary Heat from United at too high a price because United dominated Utilities, and the intercompany litigations terminated in favor of the Utilities' trustees, the debenture holders might be paid in full with interest. The debenture holders might win the negative pledge litigation but the court might hold that the collateral should be returned to Utilities' general estate and not held in trust for the benefit of the debenture holders or secured creditors. If this came to pass the debenture holders would receive substantially less, as would be the case if United's claim against Utilities was sustained by the court in the sum allowed by the master. If the claims of the Chicago Operating Companies against Utilities also were sustained, the debenture holders' position would be subject to substantial diminution. In view of all the circumstances affecting these security holders I conclude that the status awarded them by the plan is fair and equitable.

As has been stated the Utilities' prior lien stockholders, if the plan is effected, will receive shares of Realization Company stock with a value between $782,000 and $1,200,000. On liquidation, the holders of this stock are entitled to approximately $38,000,000. The stock in large part is publicly owned. The court was inclined originally to the view that the assigning of any value to Utilities' prior lien stock would work a violation of the "absolute priority" rule of Case v. Los Angeles Lumber Co., 308 U.S. 106, 60 S.Ct. 1, 84 L. Ed. 110. In a sense at least, as the Commission points out, the 103,985 shares of stock of Realization Company which are allotted to the Utilities' prior lien stockholders will be acquired from Continental Bank, The Middle West Corporation and other holders of United's preferred stock under the terms of the respective settlements with them. These claimants have agreed to relinquish the shares which Utilities' prior lien stockholders will acquire. Standing in a reorganization, however, may not be gained by grace or charity. The right of the prior lien stockholders to receive the consideration to be advanced to them under the plan of reorganization must meet the test of the absolute priority rule. A consideration of all the circumstances convinces me, however, that the Commission did not err in approving the allowance to be made to the prior lien stockholders under the plan. The Commission stated in its opinion "The allocation to the prior lien stockholders is based not on their interest in the book assets of Utilities, junior to the debenture holders, but upon the settlement of their interest in the outcome of all the controversies which the plan attempts to compromise." If the Utilities trustees should prevail in one or some of the more substantial intercompany litigations, the prior lien stockholders might receive consideration of much greater value than that allotted to them by the plan. It is impossible to apply a mathematical formula or percentage to estimate the probability of success in any one of the intercompany litigations, but the possibility of some success is ever present. It should be borne in mind that only the public holders of Utilities' prior lien stock will receive the stock of Realization Com-

pany allocated under the plan. United will receive no part of it by virtue of ownership of Utilities' prior lien stock. The recognition of the interest of the prior lien stockholders to the extent required by the Commission does not, in my opinion, violate the absolute priority rule.

The plan of reorganization originally submitted by the trustees to the Securities and Exchange Commission proposed that the public holders of Utilities' prior lien stock should receive 3/10 of a share of the stock of Realization Company for each share of the prior lien stock held by them. The Commission, after careful consideration, increased the allotment to the prior lien stockholders so that they will receive ½ of a share of the stock of Realization Company for each share of prior lien stock held. The allotment originally proposed represented approximately a 10% interest in Realization Company. The new participation amounts to approximately 17%. The figure seems to me to be somewhat on the high side, but, on canvassing all the aspects of the intercompany litigations, I think it is not beyond the bounds of fairness and equity.

United's preferred stockholders are to receive under the plan stock the value of which lies between $12,041,000 and $13,634,000, plus cash representing dividends to be paid on the common stock of Public Service Company of Indiana, Inc. as heretofore stated. The Commission has estimated that these dividends will amount to at least $245,000 as of the end of September, 1944. Approximately $9,000,000 worth of the securities which will go to United's preferred stockholders under the plan lies in the common stock of Public Service Company of Indiana, Inc. This stock represents a substantial asset and I am of the opinion that the Commission's appraisal of its value is correct. United's preferred stockholders receive considerations under the plan which are substantially less than those they would receive if the master's recommendations were approved by the court. It should be pointed out, however, that if the United trustee met defeat in the intercompany litigations or in any substantial part of them, United would not receive any participation in the Utilities estate; indeed, United's own assets probably would be subjected to payment of the claims of Continental Bank and Service Annuity Trust. The participation to be granted under the plan goes only to the public holders of United's preferred stock. Upon consideration of all the circumstances, I conclude that the allotment to be made to these stockholders is fair and equitable.

I am of the opinion also that the treatment of all other participants, not mentioned specifically herein, in the plan as modified is fair and equitable. It must be borne in mind that whatever may have been the relations of the corporate claimants and litigants in the past, any condition of domination or subserviency has long since vanished. These litigants and participants have been represented in this court by able, experienced and independent trustees and counsel. Moreover by reason of the claims filed herein and the objections thereto, the very extensive record made before the master and the extended proceedings before the Commission, all parties have had a full opportunity to appraise their positions and participations against a very complete background of fact. The trading and negotiations have proceeded for years and have been conducted at arm's length. I am of the belief that the negotiations which have resulted in the compromises effected by the plan, which dispose of every claim and every litigation, represent the essence of the appraisal by the parties of their respective positions and what their positions are worth in fact and in law. I am also of the opinion that participations under the plan have been allotted to all claimants, creditors, security holders or stockholders who are entitled to any participation. No equity can be deemed to be available for interests not embraced within the plan.

The Commission has indicated concern in respect to the question as to whether the proposed loan or advance of $2,500,000 by the Utilities trustees to the United trustee would be in contravention of the purposes and provisions of Section 12 (a) and (b) of the Holding Company Act, 15 U.S.C.A. § 79l (a, b). The Commission held that the problem which the provisions of Section 12 (a) and (b) were designed to meet "is not present in the context of the bankruptcy proceedings and the plan". It is the fact that the United trustee holds the common stock of Utilities which the Commission properly describes as "defunct". The United trustee, like the Utilities trustees, is subject to the direction and control of the court. The congressional purpose in enacting Section 12 (a) and (b) obviously was to prevent undesirable upstream loans being made to a top holding

company of an operating utility system by its subsidiaries and the consequent milking of the latter. The background of the instant proceedings is one of bankruptcy and liquidation. The loan contemplated by the plan will facilitate greatly the execution of the plan and will advance the terminal date of the liquidation. I perceive no vice or error in law in directing the Utilities trustees to make the loan as proposed.

The item of cash, in the amount of $1,286,000, to be paid by Utilities to Realization Company, is of course not subject to the provisions of Section 12. Its payment is a necessary part of the reorganization as contemplated. Accordingly, it is approved.

The court also approves those provisions of the modified plan which will safeguard the future management of the assets of the debtors. No objection has been voiced to these provisions and there can be no point in discussing them in this opinion.

As has been stated hereinbefore, the objectors to the confirmation of the plan consist of two comparatively small groups of the holders of Utilities debentures and Utilities prior lien stock. Both groups have come exceedingly late to the feast. An intervention on behalf of one group was allowed by an order of the court filed on May 25, 1943. A second group, who have not sought to intervene, appeared, for the first time on December 27, 1943, in opposition to a petition filed by the trustees seeking authority to execute the agreement of settlement with the secured creditors hereinbefore referred to.[11] Many of the objectors are shown to be rather recent purchasers of Utilities debentures and prior lien stock. This of course does not deprive them of the right to be heard in respect to a plan which will dispose of the interests acquired by them and their objections require full consideration. The fact that the objectors acquired their securities and stock with what must be deemed to be knowledge of existing litigation is, however, a fact which the court may weigh in determining their purpose.

One objection voiced to the plan, as I apprehend it, is that it is incumbent upon the court to dispose of all claims, or nearly all claims, by adjudication instead of by way of settlement by the parties. In support of this contention there is advanced the proposition that absent adjudications of most, if not all, of the claims and litigations, it is impossible to ascertain with any fair degree of certainty the positions of the respective claimants; that, therefore, the absolute priority rule of Case v. Los Angeles Lumber Co. is being set at nought. The objectors assert that without an exact estimate by the court of the chances of the respective claimants in the litigations the principle enunciated by the Supreme Court in the cited case cannot be applied. Counsel for one group of objectors in the course of the hearings before the court advanced the proposition that the litigations should be disposed of by way of compromise only after expression by the court of its estimation of the chances of success of the respective parties to the litigations preferably in terms of percentages; in short, that the court should indicate to the participating litigants their percentage of chances of success or failure in respect to each litigation;[12] that absent such estimates by the court there was no basis upon which just settlements could be arrived at. The suggestion may not be adopted for such estimates could not be deemed to be adjudications and would put the court in the position of rendering a kind of advisory opinion to the litigants. Though the facts of the various litigations before the court are highly complex, as has been repeatedly stated in this opinion, the issues presented can be adjudicated precisely like the issues in any other suit. But the fact that they are complex and involve what the court deems to be novel variations of law does not render the litigations any less susceptible to settlement under the principle of Case v. Los Angeles Lumber Co. It should be noted that Mr. Justice Douglas in the decision in the cited case, 308 U.S. 106 at page 130, 60 S.Ct. 1, at page 14, 84 L.Ed. 110, said, "There frequently will be situations involving conflicting claims to specific assets which may, in the discretion of the court, be more wisely settled by com-

---

[11] An appeal was taken by this group from the order of December 29, 1943 authorizing the trustees to execute the agreement. The Circuit Court of Appeals for this Circuit dismissed the appeal as "wholly frivolous and * * *

taken for the purpose of delay." See In re Midland United Co., 3 Cir., 141 F.2d 692.

[12] See pp. 283–286 of the transcript of the hearings on the plan, November 2, 1944.

promise rather than by litigation. * * * Settlement of such conflicting claims to the res in the possession of the court is a normal part of the process or reorganization." Further discussion of this objection would be futile.

The non-intervening objectors raise another issue. This concerns the value of the common stock of Northern Indiana Public Service Company, one of the most valuable assets which the Utilities trustees possess.[13] The value to be ascribed to this stock was the subject of an exhaustive study by the Commission, the substance of which is embodied in appendix IV of the Commission's definitive opinion. The testimony of expert witnesses as to the valuation of the Northern Indiana stock was taken by the Commission and their testimony covers many pages of the transcript of the proceedings before the Commission.[14] The estimates made by these experts differed widely. One testified that the value of Utilities' holdings was approximately $7,300,000. One of Utilities' trustees also testified as an expert. His estimate was very much higher. He stated that it was his opinion that the "instrinsic value" of Utilities' interest in Indiana was approximately $18,600,000. Simple arithmetic shows therefore that he concluded the stock to be worth about $8.60 a share. The trustee's estimate of value was based on several factors. These included a capitalization of expected future gross income and a capitalization of 1940 gross income as adjusted, and gross income, per books, for the years 1937 to 1942, inclusive, and pro forma gross income for the year 1942 giving effect to property acquisitions made by Northern Indiana during that year. The most important subsequent acquisition has been La Porte Gas & Electric Company which the witness estimated should increase Northern Indiana's revenues by about $1 a share. Employing the pro forma gross income including the benefits from La Porte, the trustee concluded that the value of Utilities' holdings was approximately $19,500,000. The Commission found this estimate of earnings to be "unduly optimistic for the long-term future." The Commission went on to state that included in the operating revenues of North-

ern Indiana, for 1940 and thereafter, were substantial sums attributable to the increased industrial activity occasioned by the defense program and the war effort. It concluded that the current revenues of the company were "extraordinarily high" and that post war revenues are very vulnerable to any substantial cut-backs. The Commission thereupon concluded, using a nine times earnings formula, that the value of Utilities' interest lay within a range of from $12,000,000 to $13,000,000.

At the hearing before me the Utilities trustee was called to the stand by counsel for the trustees for the purpose of testifying that there had been no substantial change in the financial conditions of the debtors since the approval of the plan as modified by the Commission. His testimony was received for this limited purpose. On cross-examination by counsel for the non-intervening objectors, over objections by counsel for the trustees, he was permitted to testify that he had had conversations with members of certain underwriting firms who had stated to him that the common stock of Northern Indiana might be marketed, on the basis of current market prices and conditions, at about $9 per share net to the Utilities' estate, assuming the acquisition by Northern Indiana of the properties of La Porte and an increase in the value of Northern Indiana's common stock by as much as $1 per share by reason of such acquisition. If this were the case, the value of the Northern Indiana stock which the Utilities trustees held would be worth approximately $19,-400,000, as distinguished from the value estimated by the Commission at from $12,-000,000 to $13,000,000. It will be observed also that the trustee's estimate given before the court as to the value of the Northern Indiana stock to Utilities is substantially the same as that given by him before the Commission.

 The ascertainment of a correct value for the stock of Northern Indiana owned by Utilities is a very important consideration in the instant proceeding since any increase of the actual value of that stock will be reflected immediately in the values of the participations granted by the

---

[13] The Utilities trustees hold 2,154,-395 shares of the common stock of Northern Indiana of a total of 2,181,550 shares outstanding.

[14] The entire record made before the Commission at its hearing on the plan was certified to this court. It should be stated parenthetically that the record before the Commission included the entire record made before the master.

plan of reorganization. No case has been cited to the court and none has been found in which the duty required of the court by Section 174 of the Bankruptcy Act is defined in its relation, if any, to the duty imposed on the Commission by Section 11 (f) of the Public Utility Holding Company Act. I am of the opinion that Section 174 of the Bankruptcy Act requires the court to exercise its independent judgment as to whether the plan proposed is fair and equitable and feasible and, therefore, requires the court to exercise its independent judgment in respect to such questions as the valuation of securities involved in the plan. Compare the provisions of Section 172 of the Bankruptcy Act, 11 U.S.C.A. § 572, which provide that the report of the Commission "shall be advisory only." The section cited is not applicable to the present proceedings but may supply an analogy. Compare also the duties imposed upon a district court by the provisions of Section 11(e) of the Holding Company Act. See the decision of the Court of Appeals for this Circuit in In re Securities and Exchange Commission, 3 Cir., 142 F.2d 411, 420-422.[15] I conclude also, however, that the judgment of the court in respect to these matters must be exercised by it on the record made before the Commission and if the court deems that record to be insufficient or "stale" for any reason (for example because there was a substantial change in values of stocks involved in a reorganization after the order of the Commission approving the plan had been entered), it would be the duty of the court to "remand" the record to the Commission for the taking of further testimony and for reconsideration of the pertinent issues. For analogy see I. C. C. v. Jersey City, 322 U.S. 503, 515, 64 S.Ct. 1129, and Atchison T. & S. F. R. Co. v. United States, 284 U.S. 248, 52 S.Ct. 146, 76 L.Ed. 273. The fact that one of the Utilities trustees had conversations with prospective underwriters within a week of the time of the hearing before the court (November 1 and 2, 1944) at which some of them indicated that their firms might be willing to undertake an underwriting to net Utilities $9 a share on the stock of Northern Indiana held by it, can scarcely be deemed to render the record before the Commission stale. Accordingly the testimony of the trustee in respect to this issue will be stricken out.

The question remains, however, as to what value may be properly ascribed to the 2,154,195 shares of the common stock of Northern Indiana held by the Utilities trustees. Considering the Commission's report as advisory and making use of the data upon which that report is based including the five year average of the earnings of Northern Indiana (1936 to 1940 inclusive) and weighing also the benefits of the merger with Indiana Hydro-Electric Company and the earnings to be made available from the acquisition of La Porte by Northern Indiana, the pertinent factors demonstrate that Northern Indiana's operating revenues would average approximately $21,300,000 a year, while its expenses would amount to approximately $15,100,000 a year. The expenses referred to consist of costs of operation, taxes, other than federal income taxes, depreciation and like items. If we assume, as we should, that post-war normal taxes and sur-taxes will average 40% (making no allowance for excess profits tax) and estimate interest and other proper income deductions, the net income of Northern Indiana will be found to be approximately $2,600,000. The preferred dividend requirements total approximately $1,156,000 a year. The net income of Northern Indiana applicable to the common stock amounts, therefore, to about $1,400,000. If we apply a conservative nine-times earnings formula to this income estimate, we arrive at a valuation for this equity just short of $13,000,000.

With due regard for the judgment, experience and expert qualifications of the Utilities trustee who testified before the Commission, I conclude that this valuation based upon Northern Indiana's earnings over a five year period is a closer approximation of actual value than an estimate based upon the war earnings of the corporation during an extraordinary period. The Utilities trustee may be right in his assumption, which he stated with a proper caution, that underwriters may be willing to guarantee $9 net per share to Utilities from the sale of the Northern Indiana

15 It will be observed that Section 24 (a) of the Holding Company Act, 15 U.S. C.A. § 79x, provides that, "The findings of the Commission as to the facts, if supported by substantial evidence, shall be conclusive.", but this provision may not be read into Chapter X of the Bankruptcy Act, 11 U.S.C.A. § 501 et seq., or the provisions of the two acts referred to be treated as in pari materia.

stock, but I cannot conclude that anyone paying such a price necessarily would be well advised. The price of $9 seems inflated. Contrast the testimony of the Utilities trustee with that of the other expert who gave evidence as to the value of the Northern Indiana common stock. I conclude as did the Commission, that the latter witness was too low in his estimate of value and that the "dissenting" trustee was too high in his. The knowledge is common to all investors that the reports of experts on stock values, pessimistic or optimistic, are to be taken with salt. I conclude that the formula adopted by the Commission and the basis upon which it has been applied is sound. I ascribe therefore a value of approximately $13,000,000 to the common stock of Northern Indiana held by the Utilities trustees.

The suggestion made by the objectors that this stock should be treated as if worth $9 a share is unjustified. But if it is in fact worth $9 a share, the value of the participations of the United preferred stock, of the Utilities prior lien stock and of the Utilities debentures will be raised accordingly by the automatic working of the plan. The United preferred stock would receive a participation ranging between $14,844,000 and $16,058,000 in value; the Utilities debentures, to a participation between $10,506,000 and $12,170,000 in value; the Utilities prior lien stock would be entitled to a participation ranging in value from $1,527,000 to $1,850,000. Using the Utilities debentures as an example, employing the minimum figure stated above and assuming an effective date for the plan early in 1945, it is apparent that the Utilities debenture holders would receive the equivalent of the payment of their claims in full. If the maximum value be employed, the debenture holders would receive about 120% of the face amount of their claims with interest to September 30, 1944. At the close of the argument before the court in respect to the value to be ascribed to the stock of Northern Indiana, counsel for the trustees and counsel for the Commission were requested to file briefs on this question, assuming, first, that the stock of Northern Indiana was entitled to a valuation one-third greater than that allowed it by the Commission and assuming, second, that the stock was worth $9 a share. Counsel for the objectors also filed briefs. Attached to the brief of counsel for the Commission is an appendix which gives with clarity the computations

of participations of the Utilities debenture holders and prior lien stockholders and United's preferred stockholders upon the premises suggested. That appendix is printed as an appendix to this opinion. It merits careful examination.

Bear in mind that there is to be distributed to Utilities' debenture holders 40% or 600,000 shares of the 1,500,000 new shares of Utilities, and that 60% or 900,000 shares of new Utilities stock is to go to Realization Company under the plan of reorganization. Remember also that in the distribution of the stock of Realization Company, Utilities' debenture holders are to receive 123,600 shares or 19.98%; that Utilities' prior lien stockholders are to receive 103,985 shares or 16.81%; that United's preferred stockholders are to receive 391,-122 shares or 63.21% It will be observed that if the common stock of Northern Indiana has a value in excess of that ascribed to it by the Commission, those values will be transmuted into the participations. Their values will be augmented as set out in the appendix. The value of Northern Indiana stock will not be lost to the United preferred stockholders, to the Utilities debenture holders or to its prior lien stockholders. Assuming the division of the 1,-500,000 shares of the new stock of Utilities to be fair and equitable, it follows that Utilities' debenture holders and stockholders will receive their proper share of any value lying in the Northern Indiana common stock.

Here arises the curious anomaly of the objectors' positions. The objectors are Utilities' debenture holders and prior lien stockholders. They are represented by two counsel who appear on behalf of both classes of security holders. Under these circumstances it is difficult to ascertain the exact nature of the points raised by the respective objectors insofar as any application of the decision in Case v. Los Angeles Lumber Co. is concerned. If the Utilities prior lien stockholders are awarded too large a participation by the plan obviously it will be at the expense of Utilities debenture holders. If the Utilities debenture holders receive too much under the plan, it is at the expense of the prior lien stockholders. I fail to apprehend how these two groups of objectors may take two such positions at the same time.

If the Utilities debenture holders will receive 120% of their claims with interest (which I conclude will not be the

case), it is clear that they are giving up a debt and are receiving stock in lieu of it. Under such circumstances they are entitled to some compensation for relinquishing a superior position for an inferior one. See Group of Institutional Investors v. Chicago Milwaukee R. Co., 318 U.S. 523, 569-570, 63 S.Ct. 727, 87 L.Ed. 959. If the Utilities debenture holders were to receive a 120% payment of their claims under the plan, it might be concluded that such payment was justified as compensation to them for receipt of stock in lieu of debentures. In my opinion there is no subtle appropriation of the property of one group for the benefit of another if the plan be effected. The objections to the valuation put upon the Northern Indiana stock seem to me to be evanescent and illusory.

After careful examination of all of the aspects of the respective claims, litigations, compromises and participations, I conclude that the plan of reorganization is fair and equitable. Its feasibility must be tested upon the basis of whether or not it will effect the policies embodied by Congress in the Holding Company Act. That it will do so is apparent. There is no contention to the contrary.

The court accepts as correct and adopts the findings of fact made by the Commission.

The provisions of Chapter X of the Bankruptcy Act have been applied in this proceeding insofar as is consistent.

Decrees in conformity with this opinion were filed on November 29, 1944 and December 6, 1944.

APPENDIX

TRUSTEES' MODIFIED JOINT PLAN OF REORGANIZATION

Computation of Participations of Debentureholders and Stockholders Based Upon Minimum and Maximum Valuations for the Utilities Estate as of September 30, 1944 and upon Certain Other Premises.

| | | Value of Utilities Estate | | | | | |
|---|---|---|---|---|---|---|---|
| | | Commission's Valuation | | Commission's Valuations Increased by Increase of Valuation of Northern Indiana Common Stock by 1/3 of Commission's Valuation | | Commission's Valuations Increased by Increase of Valuation of Northern Indiana Common Stock to $9 per share | |
| | | Minimum | Maximum | Minimum | Maximum | Minimum | Maximum |
| Assumed values of Utilities Estate—gross assets | | $16,278,000 | $20,478,000 | $20,278,000 | $24,811,333 | $23,667,555 | $26,867,555 |
| Less: | | | | | | | |
| Cash payment to be made to Realization Company | $1,286,000* | | | | | | |
| Cash payment to be made to Northern Indiana within six months after effective date of plan | 200,000 | | | | | | |
| Cash requirements for reorganization expenses—estimated | 300,000 | | | | | | |
| Cash payments to be made to unsecured creditors | 155,336 | | | | | | |
| Total deductions (see footnote as to first column) | | 1,941,336 | 1,941,336 | 1,941,336 | 1,941,336 | 1,941,336 | 1,941,336 |
| Balance of value of Utilities Estate—1,500,000 shares | | $14,336,664 | $18,536,664 | $18,336,664 | $22,869,997 | $21,726,219 | $24,926,219 |
| Distributed: | | | | | | | |
| To Debentureholders—40%, or 600,000 shares | | $ 5,734,666 | $ 7,414,665 | $ 7,334,666 | $ 9,147,999 | $ 8,690,488 | $ 9,970,488 |
| To Realization Company—60%, or 900,000 shares | | 8,601,998 | 11,121,998 | 11,001,998 | 13,721,998 | 13,035,731 | 14,955,731 |
| Total distribution of Utilities Estate | | $14,336,664 | $18,536,664 | $18,336,664 | $22,869,997 | $21,726,219 | $24,926,219 |
| Value per share of Utilities Common Stock | | $ 9.56 | $ 12.36 | $ 12.22 | $ 15.25 | $ 14.48 | $ 16.62 |
| REALIZATION COMPANY | | | | | | | |
| Assets | | | | | | | |
| Investment in Utilities common stock—60%, or 900,000 shares | | $ 8,601,998 | $11,121,998 | $11,001,998 | $13,721,998 | $13,035,731 | $14,955,731 |
| Cash from Utilities | | | | | | | |
| Cash Paid | $1,286,000 | | | | | | |
| Cash Loaned | 2,500,000** | 3,786,000 | 3,786,000 | 3,786,000 | 3,786,000 | 3,786,000 | 3,786,000 |
| Cash, United Estate | | 2,000,000 | 2,000,000 | 2,000,000 | 2,000,000 | 2,000,000 | 2,000,000 |
| Total assets | | $14,387,998 | $15,907,998 | $16,787,998 | $19,507,998 | $18,821,731 | $20,741,731 |
| Liabilities | | | | | | | |
| Cash to be paid to Secured Creditors | | $ 5,338,374 | $ 5,338,374 | | | | |
| Balance due on obligations to Secured Creditors | | 1,892,000 | 1,892,000 | | | | |
| Account Payable to Utilities for money borrowed | | 2,500,000 | 2,500,000 | | | | |
| Total liabilities | | $ 9,730,374 | $ 9,730,374 | $ 9,730,734 | $ 9,730,734 | $ 9,730,734 | $ 9,730,734 |
| Balance available for distribution in capital stock—618,707 shares | | $ 4,657,624 | $ 7,177,624 | $ 7,057,264 | $ 9,777,264 | $ 9,090,997 | $11,010,997 |
| Distribution of capital stock of Realization Company: | | | | | | | |
| Debentureholders of Utilities | 19.98% 123,600 shs. | $ 930,460 | $ 1,433,844 | $ 1,409,840 | $ 1,953,218 | $ 1,816,122 | $ 2,199,683 |
| Prior Lien stockholders of Utilities | 16.81% 103,985 shs. | 782,799 | 1,206,331 | 1,186,102 | 3,643,248 | 1,527,908 | 1,850,599 |
| Preferred stockholders of United | 63.21% 391,122 shs. | 2,944,365 | 4,537,449 | 4,461,322 | 6,180,798 | 5,746,967 | 6,960,715 |
| | 100.00% 618,707 shs. | | | | | | |
| Total distribution of capital stock of Realization Company | | $ 4,657,624 | $ 7,177,624 | $ 7,057,264 | $ 9,777,264 | $ 9,090,997 | $11,010,997 |
| Debentures receive | | $ 6,665,126 | $ 8,848,510 | $ 8,744,506 | $11,101,217 | $10,506,610 | $12,170,171 |
| Prior Lien stockholders receive | | 782,799 | 1,206,331 | 1,186,102 | 1,643,248 | 1,527,908 | 1,850,599 |
| United preferred stockholders receive (including 495,107 shares of Public Service Indiana Common Stock, valued at $9,097,591 exclusive of dividends distributable in connection therewith) | | 12,041,956 | 13,635,040 | 13,558,913 | 15,278,389 | 14,844,558 | 16,058,306 |

*Exclusive of cash to be loaned by the Utilities trustees to the United trustee in the estimated amount of $2,500,000.
** Estimated amount.