## In re MIDLAND·UNITED CO.*
### Appeal of EVANS.
### No. 9138.

Circuit Court of Appeals, Third Circuit.

Argued June 20, 1946.

Decided Jan. 30, 1947.

As Amended Feb. 3, 1947.

* Midland United Company and Midland Utilities Company, its principal wholly-owned subsidiary, were joined in reorganization and the case has been titled as above throughout its history.

ia, Pa., on the brief), for Securities and Exchange Commission.

Before GOODRICH and O'CONNELL, Circuit Judges, and KALODNER, District Judge.†

KALODNER, Circuit Judge.†

The issue here is whether an attorney for a protective committee for a senior security of a debtor in reorganization is disqualified from compensation for his services to the debtor estate, and reimbursement of his expenses, by reason of purchases by him and his wife of the securities of subsidiaries of the debtor, during the course of the reorganization.

The Court below ruled that there was a disqualification and this appeal is the result of its disallowance of compensation and expenses to the attorney. In doing so it held that an attorney for a protective committee for the security holders of a debtor in reorganization is a fiduciary and that regardless whether fraud or unfairness resulted, a fiduciary is barred from compensation (a) by the law of trusts and (b) by the Chandler Act, 52 Stat. 840, where he or a member of his immediate family group deals in securities of subsidiaries or affiliates of a corporate debtor in reorganization. The District Court also held it possessed the power and should exercise its discretion to deny compensation to the fiduciary under the existing circumstances.

It is unnecessary to detail the facts in view of the industrious manner in which they were recited by the Court below in its opinion—64 F.Supp. 399. The following summary outline will suffice for the purpose of this review:

Harold Evans, of Philadelphia, Pa. (David A. Kerr, and MacCoy, Brittain, Evans & Lewis, all of Philadelphia, Pa., on the brief), for appellant.

Ben W. Heineman, of Chicago, Ill. (Max Swiren and Swiren, Heineman & Antonow, all of Chicago, Ill., on the brief), for Midland United Utilities Co.

Robert S. Rubin, of Philadelphia, Pa. (Roger S. Foster, Sol., Morton E. Yohalem, Counsel, Public Utilities Division, and Alexander Cohen, Atty., all of Philadelph-

The Midland Utilities Company (Utilities), a Delaware corporation and registered holding company, filed a petition for reorganization under the provisions of Section 77B of the Bankruptcy Act, 11 U. S.C.A. § 207, on June 9, 1934.

Of primary significance is the fact that among the principal assets of Utilities were its holdings of substantially all of the common stock of the Northern Indiana Public Service Company (NIPSCO) and 75%

---

† Judge KALODNER was appointed Circuit Judge July 27, 1946.

of the common stock of Gary Electric and Gas Company (Gary Electric).

Utilities itself had outstanding in the hands of the public, $6,000,000 of debentures and $36,000,000 of preferred stock.

NIPSCO had outstanding in the hands of the public, approximately $49,750,000 of bonds and $22,000,000 of preferred stock of various classes.

Gary Electric had outstanding in the hands of the public, $7,343,000 of its bonds. Of its $5,000,000 outstanding common stock, 75% was owned by Utilities, as already mentioned, and 25% was held by the public.

From this statement it will be noted that Utilities' underlying assets were thus subject to prior claims of the public owners of the bonds and preferred stock of NIPSCO and the bonds and 25% of the common stock of Gary Electric.

The appellant, Mr. Harold Evans, was the attorney for the Protective Committee of Utilities' Debentures known as the "Magill Committee." The Committee represented almost one-third of the $6,000,000 publicly-owned debentures of Utilities.[1] Mr. Evans became counsel for the Magill Committee November 1, 1934, and represented it for a period of about 11 years.

The appellant's petition below for compensation disclosed that in 1936 and 1937 he purchased 100 shares of the preferred stock of NIPSCO and held them until they were redeemed in October, 1944. It also revealed that his wife owned some debentures of Utilities and preferred stock of NIPSCO prior to the reorganization proceeding and that she engaged in five separate transactions in the securities of NIPSCO and Gary Electric during the pendency of the reorganization proceeding. The full details of these transactions are recited in the opinion of the Court below. At the time the appeal was heard Mr. Evans stated that while Mrs. Evans made the purchases entirely with her own funds, she engaged in the various transactions with his "entire approval and knowledge."

That brings us down to the questions which must be resolved in this review:

First, the appellant vigorously contends that neither the Bankruptcy Act (whether under Section 77B or Chapter X, 11 U.S. C.A. §§ 207, 501 et seq., nor the cases decided thereunder, nor the law of trusts, bars compensation to a fiduciary who deals in securities of a solvent operating subsidiary of a debtor in reorganization.

Second, the appellant asserts that there was no actual conflict of interest between the debtor in reorganization and the subsidiaries in whose securities he and his wife dealt during the course of the reorganization.

On the first point the appellant particularly urges that Section 249 of the Bankruptcy Act, Sec. 649, 11 U.S.C.A.,[2] does not bar him from recovery of compensation and that the District Court erred in ruling to the contrary.

At the time the reorganization petition was filed on June 9, 1934, the proceeding was governed by the provisions of the Bankruptcy Act of July 1, 1898, c. 541, Section 77B, as amended by the Act of June 7, 1934, c. 424, Section 1, 48 Stat. 912, 11 U.S.C.A. § 207.

Section 207, sub. c(9) provided:

"Upon approving the petition or answer or at any time thereafter, the judge, in addition to the jurisdiction and powers else-

---

[1] The exact amount was $1,859,500.

[2] Sec. 249. "Statement of claims or stock acquired or transferred after commencement of proceeding

"Any persons seeking compensation for services rendered or reimbursement for costs and expenses incurred in a proceeding under this chapter shall file with the court a statement under oath showing the claims against, or stock of, the debtor, if any, in which a beneficial interest, direct or indirect, has been acquired or transferred by him or for his account, after the commencement of such proceeding. No compensation or reimbursement shall be allowed to any committee or attorney, or other person acting in the proceedings in a representative or fiduciary capacity, who at any time after assuming to act in such capacity has purchased or sold such claims or stock, or by whom or for whose account such claims or stock have, without the prior consent or subsequent approval of the judge, been otherwise acquired or transferred. July 1, 1898, c. 541, § 249, as added June 22, 1938, c. 575, § 1, 52 Stat. 901."

where in this section conferred upon him * * * may allow *a reasonable compensation for the services rendered* and reimbursement for the actual and necessary expenses incurred in connection with the proceeding and the plan by officers, parties in interest, depositaries, reorganization managers and committees or other representatives of creditors or stockholders, and the attorneys or agents of any of the foregoing and of the debtor, * * *" (Emphasis supplied)

Sections 241, 242,[3] 243,[4] 11 U.S.C.A. §§ 641, 642 and 643 respectively of the Chandler Act, taken from Section 77B, as amended by the Act of June 7, 1934, 11 U.S.C.A. Section 207, sub. c(9), made no change in the provisions of the latter that the bankruptcy court "may allow a reasonable compensation for the services rendered. * * *"

In Woods v. City National Bank & Trust Co., 1941, 312 U.S. 262, 61 S.Ct. 493, 85 L.Ed. 820, the Supreme Court cited Section 221(4)[5] as bearing upon the question of allowance of "reasonable compensation" for services rendered.

The Woods case,[6] as did American United Mutual Life Insurance Co. v. City of Avon Park, 1940, 311 U.S. 138, 61 S.Ct. 157, 85 L.Ed. 91, 136 A.L.R. 860, specifically noted the scope of the power of the bankruptcy court in the allowance of compensation and the requirement for "loyal and disinterested service."

Said the Supreme Court in the Woods case (312 U.S. pp. 267, 268, 61 S.Ct. 497):

"* * * Under Ch. X of the Chandler Act the bankruptcy court has plenary power to review all fees and expenses in connection with the reorganization from whatever source they may be payable. [Citing in a footnote Section 221(4)]. Reasonable compensation for services rendered may be allowed. The claimant, however,

---

[3] Section 242 provides:

"The judge may allow reasonable compensation for services rendered and reimbursement for proper costs and expenses incurred in connection with the administration of an estate in a proceeding under this chapter or in connection with a plan approved by the judge, whether or not accepted by creditors and stockholders or finally confirmed by the judge—

"(1) by indenture trustees, depositaries, reorganization managers, and committees or representatives of creditors or stockholders;

"(2) by any other parties in interest except the Securities and Exchange Commission; and

"(3) by the attorneys or agents for any of the foregoing except the Securities and Exchange Commission, July 1, 1898, c. 541, § 242, as added June 22, 1938, c. 575, § 1, 52 Stat. 900."

[4] Section 243 provides:

"The judge may allow reasonable compensation for services rendered and reimbursement for proper costs and expenses incurred by creditors and stockholders, and the attorneys for any of them, in connection with the submission by them of suggestions for a plan or of proposals in the form of plans, or in connection with objections by them to the confirmation of a plan, or in connection with the administration of the estate. In fixing any such allowances, the judge shall give consideration only to the services which contributed to the plan confirmed or to the refusal of confirmation of a plan, or which were beneficial in the administration of the estate, and to the proper costs and expenses incidental thereto. July 1, 1898, c. 541, § 243, as added June 22, 1938, c. 575, § 1, 52 Stat. 900."

[5] Section 221(4) provides:

"The judge shall confirm a plan if satisfied that—all payments made or promised by the debtor or by a corporation issuing securities or acquiring property under the plan or by any other person, for services and for costs and expenses in, or in connection with, the proceeding or in connection with the plan and incident to the reorganization, have been fully disclosed to the judge and are reasonable or, if to be fixed after confirmation of the plan, will be subject to the approval of the judge; and * * *"

[6] The Woods case originally came into the United States District Court upon the filing of petitions under Section 77B. Pursuant to Section 276, sub. c (2) of the Chandler Act, the bankruptcy court made that Chapter applicable to the entire proceeding. In the instant case the District Court also applied the provisions of Chapter X, D.C., 58 F.Supp. 667, 685. Similarly in In re Mountain States Power Co., 3 Cir., 1941, 118 F.2d 405, and in In re Reynolds Investing Co., 3 Cir., 1942, 130 F.2d 60, this Court applied Chapter X in reorganization proceedings begun under Section 77B and completed under Chapter X.

344

has the burden of proving their worth. Furthermore, 'reasonable compensation for services rendered' necessarily implies loyal and disinterested service in the interest of those for whom the claimant purported to act. American United Mut. Life Ins. Co. v. City of Avon Park, 311 U.S. 138, 61 S.Ct. 157, 85 L.Ed. 91 [136 A.L.R. 860]. * * * Where a claimant, who represented members of the investing public, was serving more than one master or was subject to conflicting interests, he should be denied compensation. It is no answer to say that fraud or unfairness were not shown to have resulted. * * * *Where an actual conflict of interest exists, no more need be shown in this type of case to support a denial of compensation.*" (Emphasis supplied)

In the Avon Park case[7] the Court said, (311 U.S. p. 147, 61 S.Ct. 162):

"* * * The scope of the power of the court embraces denial of compensation to those who have purchased or sold securities during or in contemplation of the proceedings. *As in case of reorganizations under former § 77B, 11 U.S.C.A. § 207, the provision in § 83, sub. b, 11 U.S.C. § 403(b), 11 U.S.C.A. § 403, sub. b, for allowance of 'reasonable compensation' for 'services rendered' necessarily implies 'loyal and disinterested service in the interests of the persons' for whom the claimant purported to act.* In re Paramount-Publix Corp., D.C., 12 F.Supp. 823, 828."

From the above it will be seen that the provisions of Section 77B, 11 U.S.C.A. § 207, sub. c(9), which were construed by the Supreme Court in the Woods and Avon Park cases as embodying the equitable principles declared by the law of trusts, were preserved in the Chandler Act amendments to the prior Bankruptcy Act. Accordingly, the rule promulgated by Section 249 is not inconsistent with the Bankruptcy Act as it existed prior to 1938 or any of the Chandler Act sections cited.

Section 249 has become a bone of contention here, the appellant asserting that that section merely creates a bar against trading in the "stock of, the debtor" and therefore precludes any denial of compensation in instances where the trading was in the solvent subsidiaries of the debtor. In this connection, the difficulty with the appellant's position is that he seems to regard the prohibition in Section 249 against dealing in the "stock of, the debtor" as the only arrow in the quiver of the bankruptcy court in the situation which prevails in the instant case.

Appellant's argument that Section 249 by specifically barring trading in the "stock of, the debtor" also bars the bankruptcy court from denying compensation where the trading is in the stock of a solvent subsidiary, is tantamount to a contention that Section 249 has repealed Section 221(4) and Sections 241, 242, 243, and has limited the exercise of the inherent equitable jurisdiction of a court of bankruptcy which the Supreme Court ruled in the Avon Park case (311 U.S. p. 146, 61 S.Ct. 162) "* * * is not dependent on expressed statutory provisions" of the Bankruptcy Act.

In that respect the appellant's contention does violence to the well-established rule, recently re-stated in Porter v. Warner Holding Co., 66 S.Ct. 1086, 1089, 90 L.Ed. 1332, that the inherent equitable power of the district court available for the purpose and complete exercise of its jurisdiction "* * * is not to be denied or limited in the absence of a clear and valid legislative command." Said the Court, (66 S.Ct. 1089, 90 L.Ed. 1332):

"* * * Unless a statute in so many words, or by a necessary and inescapable inference, restricts the court's jurisdiction in equity, the full scope of that jurisdiction is to be recognized and applied. 'The great principles of equity, securing complete justice, should not be yielded to light inferences, or doubtful construction.' Brown v. Swann, 10 Pet. 497, 503, 9 L.Ed. 508 [511]. See also Hecht Co. v. Bowles, supra, 321 U.S. [321], 330, 64 S.Ct. [587], 592 [88 L.Ed. 754, 761]."

Certainly neither Section 249 (nor its legislative history as cited by the appellant) "in so many words," or by a "neces-

---

[7] This case dealt with a reorganization under Chapter IX of the Bankruptcy Act, 50 Stat. 653, 52 Stat. 939, 940, 11 U.S. C.A. § 401 et seq.

sary and inescapable inference" can be interpreted as restricting the bankruptcy court's jurisdiction in equity or the application of basic equitable principles to the conduct of fiduciaries as defined by the Supreme Court in the Woods and Avon Park cases.

The following quotation from the final report of the Senate Committee, Sen.Rep. No.1916, 75th Cong., 3d Sess.(1938), p. 19, is clearly dispositive of any contention that Section 249 or any other section of Chapter X was intended to limit the equity jurisdiction of the bankruptcy court. Said the report on the subject:

"* * * it (section 77B) gave the courts the power to scrutinize the compensation and activities of the persons who participated in reorganization proceedings. These were signal gains. *All of them are preserved and strengthened in Chapter X of the bill.*" (Emphasis supplied)

In our view the specific prohibition in Section 249 against trading in the "stock of the debtor" was intended to augment and not to limit the jurisdiction of the Bankruptcy court: the prohibition proscribed dealing in the stock of the debtor regardless of whether or not a conflict of interest existed, whereas, under general equitable principles the existence of actual or potential conflict was required to bar a fiduciary from compensation.

We do not believe, however, that the stricter rule promulgated in Section 249 against trading in the stock of the debtor, even where no conflict existed, can be extended by judicial interpretation to cover the stock of subsidiaries or affiliates of the debtor in reorganization in the absence of a conflict of interest.

Sight must not be lost, however, of the fact that Section 249 not only prohibits trading in the "stock of, the debtor", but also specifically enjoins allowance of compensation where "a beneficial interest, direct or indirect, has been acquired or transferred * * *" by any person seeking compensation for services rendered in a reorganization proceeding in *"claims against, or stock of, the debtor".*

The facts disclose that there was violation of the latter provision of Section 249 when Mr. Evans bought the preferred stock of NIPSCO and Mrs. Evans bought the preferred stock and bonds of NIPSCO because at the time of these purchases NIPSCO had disputed and undisputed claims against Utilities of some $3,569,000 exclusive of interest.[8] In purchasing these securities of NIPSCO it is obvious that the Evans were indirectly purchasing a beneficial interest in "claims against * * * the debtor" Utilities. Recovery by NIPSCO against Utilities of any or all of its $3,569,000 claim would, of course, inure to the benefit of the preferred stockholders of NIPSCO, particularly in view of the fact that NIPSCO owed preferred stockholders dividend arrearages of approximately $2,760,000. It was, of course, to the interest of Utilities to dispose of NIPSCO's claims on a basis most favorable to it with resultant benefit to the owners of its debentures represented by Mr. Evans.

There was also present the factor that Gary Electric had an undisputed claim against Utilities of $352,000, plus interest, when Mrs. Evans bought stock in Gary in 1935. As a common stockholder of Gary Electric, Mrs. Evans had a distinct interest in this $352,000 claim against Utilities. At the same time it was equally to the interest of Utilities and its debenture holders represented by Mr. Evans to settle this indebtedness on terms most favorable to it.

So much then for the discussion as to Section 249 and its bearing upon this case.

---

[8] The $3,569,000 was made up as follows: There was an undisputed claim on certain notes amounting to $668,966 in 1934. There was a $2,900,000 claim for damages for breach of a contract made in 1930 pursuant to which NIPSCO agreed to issue and sell, and Utilities agreed to purchase 500,000 shares of NIPSCO common stock at a price of $10 per share. Utilities accepted and paid for 210,000 shares but on August 27, 1934, pursuant to a court order, disaffirmed the contract as to the remaining 290,000 shares. The $3,569,000 total of undisputed and disputed claims is exclusive of interest on the $668,966 undisputed claim from June 9, 1934 to September 30, 1944 which amounted to an additional $533,000. See footnote 7 of opinion Sur Approval of Plan, D.C., 58 F.Supp. 667 at page 673.

However, independent of Section 249, we hold that appellant is barred from recovery under the principles enunciated in the Woods and the Avon Park cases. They hold, as already pointed out, that the bankruptcy court had plenary power to deny compensation to a fiduciary in a reorganization proceeding "where an actual conflict of interest exists" regardless of whether "fraud or unfairness" resulted.

The appellant does not dispute the fact that he was a fiduciary for Utilities' debenture holders and that as such he owed them a duty of loyalty. It is necessary, then, only to ascertain from the record as to whether or not there was an actual conflict of interest.

Now as to the existence of an actual conflict or adversity of interest as demonstrated by the record in this case (exclusive of that inherent in the claims discussed in relation to Section 249):

Mr. Evans was attorney for the Magill Committee which represented almost $2,000,000—one-third of the publicly owned debentures of Utilities, which, it will be recalled, owned substantially all of the common stock of NIPSCO ($18,000,000) and 75% of the common stock of Gary Electric ($3,750,000). As already pointed out, Utilities common stock interest in the two subsidiaries was subject to prior claims of the public owners of some $72,000,000 bonds and preferred stock of NIPSCO and $7,343,000 of bonds of Gary Electric.

But there was more to this relationship between Utilities, NIPSCO and Gary Electric than the former's common stock interests in the latter two corporations, as will appear from the following.

First as to the relationship between Utilities and NIPSCO:

As of December 31, 1935, there were dividend arrearages of approximately $2,760,000 [9] on NIPSCO's preferred stock and as of December 31, 1941, unpaid preferred stock dividends still amounted to approximately $2,238,000. [10] The purchases of NIPSCO preferred stock by both Mr. and Mrs. Evans were made, it will be recalled, during 1935-36-37-39 when these dividend arrearages existed. The arrearages were ultimately paid off and the preferred stock refinanced in 1944 by a new issue of 5% preferred stock, together with certain cash payments in exchange for the various classes of old preferred. Non-accepting stockholders received the call price plus accrued dividends. Mr. and Mrs. Evans held their preferred stock until the refinancing took place in 1944 and profited accordingly.

It is, of course, obvious that, as the holder of all of the common stock of NIPSCO it was to the interest of Utilities that NIPSCO adjust its problem of dividend arrearages on its preferred stock on the most favorable basis.

Further, it was to NIPSCO's interest and therefore to Utilities' interest to convert its 7%, 6% and 5½% preferred stock into one class of 5% preferred stock. Any benefit to Utilities as owner of NIPSCO common stock would inure to the benefit of the Utilities' debenture owners represented by Mr. Evans. As to this, it must be kept in mind that Mr. Evans was the owner of NIPSCO 7% preferred (purchased in 1936 and 1937) and Mrs. Evans was the owner of 6% preferred (purchased in October, 1935) and 7% preferred (purchased in 1936 and 1939). Naturally it was to the interest of Mr. and Mrs. Evans that they collect the arrearage due on their preferred stock and that the dividend rate not be reduced. That interest was directly in conflict with the interest of Utilities as the owners of the common stock of NIPSCO.

Second, as to the relationship between Utilities and Gary Electric:

Mrs. Evans purchased common stock in Gary Electric in 1935 during the reorganization proceedings. It is apparent that, 75% of the common stock of Gary Electric being owned by Utilities, wherever the interest of the majority and the minority common stock holders failed to coincide, the interest of Mrs. Evans would conflict

---

[9] See Second Cumulative Report of Trustees of Midland Utilities for the period July 7, 1934, to June 30, 1936, at page 17.

[10] See Report of Successor Trustees of the Estate of Midland Utilities Company for the period January 1, 1941, to December 31, 1941, at page 46.

with the interest of Utilites and its debenture holders, as to which Mr. Evans enjoyed a fiduciary relationship.

Again, the terms of settlement with the outstanding 25% common stock of Gary Electric constituted an important issue to be resolved in the reorganization proceedings. Thus, here also the interest of the debenture holders represented by the Magill Committee of which Mr. Evans was counsel, was in direct conflict with the interest of the owners of the minority common stock of whom Mrs. Evans was one.

In summary then, the over-all problem of Utilities' reorganization inevitably encompassed the compromise and adjustment of the disputed and undisputed claims against it of NIPSCO and Gary Electric; the recasting of the capital structure of NIPSCO so as to clean up arrearages on its three classes of publicly-held preferred stock; the refunding of its funded indebtedness so as to reduce fixed charges; and the general financial reorganization and rehabilitation of both NIPSCO and Gary Electric in order to make available to Utilities disposition of their net earnings.

During these complex proceedings operating control of the subsidiaries was in charge of the trustees of Utilities, and Mr. Evans as attorney of the Magill Committee, as well as counsel for similar committees, consulted with the trustees and passed judgment anent the problems of operating control and recapitalization of the subsidiaries.

The record discloses that NIPSCO in fact intervened in the reorganization proceedings before the Commission in 1943, prior to the redemption of Mr. and Mrs. Evans' NIPSCO preferred in October, 1944.

In his petition for compensation Mr. Evans listed the services which he rendered in "examining numerous petitions filed by the Trustees and other parties in interest and determining the action to be taken in regard thereto," and in "studying proposed merger of Gary Electric and Gas Company with Northern Indiana Public Service Company": See Addendum to Appellant's Brief, pp. 34, 35.

It is clear from this recital that the interests of Mr. and Mrs. Evans in the two subsidiaries were in conflict with the interest of Utilities. Mr. Evans as attorney for the Magill Committee was under a continuing duty to act for the best interest of Utilities debenture holders in the recapitalization of the subsidiaries and their financial rehabilitation, and this interest as a fiduciary frequently ran counter to his interest and that of Mrs. Evans as security holders of the subsidiaries.

It will be noted that we have regarded Mrs. Evans' transactions as being in the same category as those of Mr. Evans. While she financed her securities dealings entirely with her own funds, Mr. Evans candidly stated that she engaged in the various transactions with his "entire approval and knowledge." Under such circumstances it is clear that the bankruptcy court was justified, in the exercise of its proper powers, in extending the principles applicable to the conduct of the fiduciary to the fiduciary's wife. The settled rule in equity is that where a fiduciary is barred from compensation the prohibition extends to his wife: Holman v. Ryon, 1932, 61 App. D.C. 10, 56 F.2d 307, 311, and cases collected in 131 A.L.R. 990 (1940). In doing so we give full recognition to the circumstance that, as the Court below noted, " * * * his services were performed skillfully and well" and as stated by Mr. Robert Rubin, attorney for the Securities and Exchange Commission when the appeal was heard, " * * * that there is in this case no reflection on the personal integrity of Mr. Evans or on the amount of work that he has done, or the skill with which he did it."

In view of our disposition of the questions involved we agree with the bankruptcy court that it would be futile to discuss the transactions of one of appellant's law partners in the securities of the subsidiaries on the independent advice of his broker, which were unknown to Mr. Evans and without the knowledge of the partner that they were Utilities' subsidiaries. The same holds true of the transactions of the two trust estates of which Mr. Evans was co-trustee.

The remaining contentions of the appellant can be disposed of briefly.

First, the bankruptcy court denied the appellant reimbursement for out-of-pocket expenses under Section 249 and under the general equitable principles as discussed in the Woods case. An examination of the appellant's statement of his expenses as set forth in the Addendum to his brief (p. 41) clearly reveals that they were not made for the benefit of the estate within the ruling in the Woods case. See 2 Scott on Trusts (1939), Section 245.1

■ Secondly, as to the appellant's assertion that he requested the bankruptcy court to give subsequent approval to the transactions in the subsidiaries and that the court erred in holding as a matter of law that it did not have the power to grant such approval under the circumstances, we are of the opinion that such ruling was in accord with Otis & Co. v. Insurance Bldg. Corp., 1 Cir., 1940, 110 F.2d 333.

Finally, that case, and our holding in Cosgrove-Meehan Coal Corp., 3 Cir., 1943, 136 F.2d 3, 5, 6, certiorari denied 320 U.S. 377, 64 S.Ct. 91, 88 L.Ed. 466, are dispositive of the appellant's contention as to the "retroactive" application of Section 249.

For the reasons stated the judgment of the District Court is affirmed.

GOODRICH, Circuit Judge (concurring).

The point to be made in this concurring opinion is not one which will affect the result in this case for the majority opinion demonstrates the reason we all feel why, under the statute and general principles of law applicable, Mr. Evans must lose out even though his dealings were in the shares of a subsidiary and not the main debtor company. But I find no reason that I can think of, why that rule should be applicable with regard to the purchases made by Mrs. Evans. Nobody would, these days, fall back on the old common law unity of husband and wife now that a married woman may keep her own money, if she is lucky enough to have any, and trade with it as she pleases. The facts here show that Mr. Evans knew about and approved the purchase by Mrs. Evans. Suppose he did not? There is authority which says in that sort of case the rule does not apply. In re Philadelphia & Reading Coal & Iron Co., D.C.,E.D.Pa.,1945, 61 F.Supp. 120.[1] Suppose he had known about it and then disapproved it? Mrs. Evans certainly could have made the investment just the same. Would that fact have precluded her husband from compensation?

The rule applied in this case becomes somewhat attenuated when the dealing is not directly in the trust property itself, but in a subsidiary corporation. It seems to me that the attenuation goes to the point where the rule loses all its force when applied to dealings by a wife in that subsidiary. Even where a trustee sells part of the trust res to his wife there is divergency of authority, some cases holding the transaction valid.[2] Here there was no purchase-

---

[1] See especially p. 128: "This includes Mr. Bortin. His wife traded in the securities of the Company [being reorganized] during the period of his employment but I accept his testimony that he did not know of it, did not advise her in connection with it and never discussed with her the affairs of the Company. * * * In any event, I do not think that trading by a wife without the consent, advice or knowledge of the husband is trading by him or for his account either directly or indirectly."

[2] 2 Scott, Trusts (1939) p. 867 and 1946 Supplement p. 9: "Where a trustee sells trust property to his wife without any agreement or understanding that she will hold it for or reconvey it to him, there is a difference of opinion on the question whether the sale is voidable. In some cases it is held that the mere fact that the trustee's wife is the purchaser is enough to make the sale voidable; in others it is held that that fact is merely some evidence that there was an understanding that she was to buy the property for him or that the sale was made at an inadequate price in order to favor her, but that the mere fact that the purchaser was the trustee's wife is not of itself a sufficient ground for avoiding the sale if in all other respects it is proper. [Citing the following cases in footnote: Crawford v. Gray, 131 Ind. 53, 30 N.E. 885 (1891); Cox v. Simmerman, 1932, 243 Ky. 474, 48 S.W.2d 1078; Burrell v. Burrell's Trustees, [1915] S.C. 333 (Scotland). In Vinal v. Gove, 1931, 275 Mass. 235, 175 N.E. 464, it was held that where the trustee's wife purchased trust property on foreclosure sale under a first mortgage in order to protect her own in-

of the trust property either by Mr. or Mrs. Evans which would cause a sale between husband and wife to be disallowed. There was simply an investment which was made in the property of a subsidiary concern whose interest clashed with that of the principal debtor. It seems to me in such a case the husband should not be affected one way or the other by his wife's business dealings.

terest under a second mortgage, the sale would not be set aside if it was a fair sale. In Lange v. McIntosh, 1937, 340 Mo. 247, 100 S.W.2d 456, where a trustee under a mortgage sold property to his wife who owned some of the notes which were secured by the mortgage, it was held that the sale could be set aside where the property was sold at a small fraction of its value and no other bidders were present.] * * *"