In the Matter of CHICAGO, MILWAU-KEE, ST. PAUL AND PACIFIC RAILROAD CO., Debtor.

Appeal of STICKNEY CORPORATION and David D. Rosenstein, Applicants–Appellants,

v.

CHICAGO MILWAUKEE CORPORA-TION and the Debtor, Objectors–Appellees.

No. 86–2713.

United States Court of Appeals, Seventh Circuit.

Argued June 2, 1987.

Decided Feb. 8, 1988.

As Amended Feb. 22, 1988.

David D. Rosenstein, Law Office of David D. Rosenstein, Chicago, Ill., for applicants-appellants.

Barry Levenstam, Jenner & Block, Chicago, Ill., for objectors-appellees.

Before BAUER, Chief Judge, COFFEY, Circuit Judge, and ESCHBACH, Senior Circuit Judge.

COFFEY, Circuit Judge.

Attorney David D. Rosenstein appeals from a district court order denying his application for attorney's fees to compensate him for his work on the bankruptcy court supervised reorganization of the Chicago, Milwaukee, St. Paul and Pacific Railroad Company. We affirm.

### I.

This case has its genesis in the reorganization of the Chicago, Milwaukee, St. Paul and Pacific Railroad Company (the "Milwaukee Road") commenced in the United States Bankruptcy Court for the Northern District of Illinois in 1977. Initially, attorney Rosenstein participated in litigation against the Milwaukee Road during 1968, representing the preferred shareholders of the Milwaukee Road before the Interstate Commerce Commission in two class action lawsuits challenging another corporation's (Northwest Industries) offer to exchange its preferred stock for Milwaukee Road's preferred stock. Among the shareholders he represented was Morton Weinress, a Chicago investment banker who individually had substantial holdings in the securities of the Milwaukee Road and at the same time acted as a financial advisor to other investors who held substantial interests in railroad securities.

In 1975, Weinress, who was acting as the class representative of debenture holders of the Milwaukee Road, in a federal class action lawsuit referred to as the *McDonald* litigation (named after one of the plaintiff/debenture holders) to force the railroad

to pay interest on its income debentures, once again retained Rosenstein. The district court approved a settlement in the lawsuit (1977). McDonald and some of the other plaintiffs objected to and appealed the court-approved settlement on the ground that Weinress had a conflict of interest based upon his acting in the dual capacity as class representative of debenture holders and also as an individual owner of both stock and debenture securities of the railroad. We affirmed the settlement, *McDonald v. Chicago Milwaukee Corporation*, 565 F.2d 416 (7th Cir.1977), and approved an award of attorney's fees to Rosenstein of $225,000. Because the Milwaukee Road did not pay the attorneys fees before the railroad filed for bankruptcy on December 19, 1977, Rosenstein filed as a creditor of the estate. The proposed plan of reorganization, filed on March 31, 1983, included a provision for the payment of 5% interest on the claims of trade creditors.

In 1981, Rosenstein proposed to Basil Vasiliou, an investor associated with a company named Bronstein Factors, Inc., that Vasiliou purchase Rosenstein's *McDonald* claim at a discount. Vasiliou decided against purchasing the claim, but in June of 1981 he and one of his associates joined Rosenstein and Weinress in forming the Stickney Corporation for the express purpose of acquiring "trade creditor" claims against the debtor.[1] At the time of the incorporation, each of the four investors initially purchased 25% of Stickney's stock for $5,000. Some time later, in December of 1981, the four investors were called upon at this time to loan money to the corporation, and each of them loaned the Stickney Corporation $20,000 for a total investment of $25,000 by each investor.

On May 1, 1982, the Stickney Corporation redeemed the interests held by Vasiliou and his associate, and cancelled their $20,000 notes in exchange for about half of the trade creditor claims Stickney had acquired. After May 1, 1982, Rosenstein and Weinress were the only remaining share-holders of the Stickney Corporation each holding a 50% interest. After Weinress suffered a stroke in January of 1983, he executed a general power of attorney in favor of his wife Jane Weinress. Mr. Weinress died a year later in January, 1984.

Some time during May, 1983, in what the parties agree was an undocumented transaction, the Stickney Corporation repurchased Weinress's stock and Rosenstein became Stickney's president, sole director, and sole shareholder. Although Rosenstein is uncertain exactly when in May, 1983 this transaction occurred, the company's May 20, 1983 annual report listed him not only as Stickney's president but also as the sole director.

Rosenstein testified that in early 1983, the Stickney Corporation (Rosenstein owned a 50% interest), in an attempt to obtain an increased interest rate from the debtor on its trade creditor claims, retained Rosenstein. Jane Weinress, now acting on behalf of her husband pursuant to her general power of attorney, signed the written retainer agreement (drafted by Rosenstein in letter form). The retainer agreement provided that Rosenstein would not only work on behalf of the Stickney Corporation to obtain a higher rate of interest on its trade creditor claims, but "also on behalf of the entire class of trade creditor claimants...." Rosenstein's agreement also recited: (1) the provisions of the pending reorganization plan dealing with the payment of trade creditor claims, (2) that contesting the proposed rate of interest would be time consuming, and (3) that Stickney may attempt to seek reimbursement from the bankruptcy estate if its efforts to obtain a higher rate of interest for trade to creditors was deemed beneficial to the reorganization. The letter continued:

"While you (Rosenstein) should maintain records of your time, notwithstanding the time spent, you will be paid by Stickney: (a) not more than $15,000 during the balance of the calendar year 1983, (b) not more than $15,000 during 1984, and (c) in total, not more than the greater of

---

**1.** A trade creditor company is a company to whom the debtor owes money because of the debtor's purchase of goods and/or services from the trade creditor company.

either (i) $50,000, or (ii) one-half of the amount that Stickney actually collects on its claims less the amount that Stickney would have collected on such claims if the 5% simple interest rate proposed in the plan was approved."

In an obvious attempt to allow him to represent other trade creditor claimants, the letter also contained a provision authorizing him to do so, but stating that in such a situation, "it is expected that they (other trade creditors) will bear a pro-rata share of your fees and costs."

Pursuant to his retainer agreement, Rosenstein began to participate in the Milwaukee Road reorganization proceedings in May of 1983. Rosenstein testified before the special master that Stickney engaged his services for the purpose of "seek[ing] to obtain a higher rate of interest for the claims of trade creditors." At some time during 1985, another trade creditor, Bronstein Factors, retained Rosenstein for the same purpose as Stickney: to gain a higher rate of interest on its trade claims against the Milwaukee Road. Bronstein received $1,036,184 from the railroad when its claims and interest were paid in October 1985.

Between January and May, 1982, the Stickney Corporation went about soliciting and eventually purchasing approximately $370,000 worth of trade creditor claims against the Milwaukee Road from approximately sixty-five trade creditors at substantial discounts. Overall, the Stickney Corporation paid 23% of the face value, or approximately $86,000 for the claims purchased during this six-month period. Stickney continued to purchase discounted trade creditor claims through April 24, 1984. After signing the retainer agreement in May of 1983, Stickney purchased claims with a face value of more than $80,000 for approximately $25,000.

On February 19, 1985 the district court approved the sale of the Milwaukee Road to the Soo Line. In April, 1985 Rosenstein

met with counsel for the trustee, the Chicago Milwaukee Corporation, and Pullman Leasing, another trade creditor, to discuss the possible settlement of the interest rate issue. In June, 1985, the parties reached a settlement providing for an interest rate of 7.5% until February 19, 1985, and 8.5% after that date. The district court confirmed the amended 1985 plan of reorganization which included these interest rate increases, and entered an order implementing the plan on July 29, 1985. In accordance with the terms of their retainer agreement, the Stickney Corporation paid Rosenstein (the lawyer) a total of $50,000 in attorney's fees and reimbursed him for $4,733.50 in expenses based upon his work in obtaining a higher rate of interest for the Stickney Corporation with respect to its claims against the railroad.

On October 10, 1985, the Milwaukee Road made final payments on trade creditors' claims. The Stickney Corporation received a total of $580,204.22. As the special master in bankruptcy found, Rosenstein's interest in the payment to the Stickney Corporation amounted to approximately $424,000; the remainder of the payment went to the Weinress estate pursuant to Rosenstein's earlier agreement with Mrs. Weinress (to finalize the purchase of her interest in Stickney).

The Stickney Corporation (Rosenstein controlled 100%) and Rosenstein (the lawyer) filed a joint application for attorney's fees on August 5, 1985, seeking compensation from the debtor's estate in the amount of $341,056.05 plus a multiplier of 2 or 3 for legal services rendered by Rosenstein and his law associate, attorney Robert Hurwitz, on behalf of Stickney. In the application, Rosenstein argued that because his legal services on the interest rate issue benefited other trade creditors as well as the bankruptcy estate, he was entitled to have the debtors estate (the bankruptcy estate) pay his legal fees.[2]

---

**2.** At the time the Milwaukee Road filed its petition for bankruptcy, section 77(c)(12) of the Act provided:

"[T]he judge *may* make an allowance, to be paid out of the debtor's estate, for the actual

and reasonable expenses (including reasonable attorney's fees) incurred in connection with the proceeding and the plan by parties in interest...."

In his affidavit in support of his application for attorneys fees, Rosenstein stated that from May 9, 1983 to the end of 1983, he worked 491.5 hours (40% of his total work hours for that period) representing the Stickney Corporation on the interest rate issue. During that period of time, he filed two documents with the Interstate Commerce Commission and one with the district court, comprising a total of eleven pages. He filed a report stating that he spent the remainder of his 491.5 hours attending bankruptcy court proceedings, reviewing court documents, discussing various matters with other counsel, and performing legal research.

In 1984, Rosenstein filed another report setting forth that he worked 902.75 hours (50% of his total time for that year) representing the Stickney Corporation. He filed six documents totaling thirty-four pages, drafted one four-page motion that he did not file, and wrote two one-page letters to the trustee's counsel. The remainder of his 902.75 hours he alleges were spent appearing in court, performing legal research, and communicating with other parties.

Rosenstein testified that he spent 715.25 hours (60% of his total time for that year) from January through July 1985, representing both the Stickney Corporation and Bronstein Factors, Inc. During this period he filed a total of four documents, totaling thirty-one pages, on behalf of Stickney and/or Bronstein. Rosenstein allegedly spent more than one hundred of these hours preparing Stickney's fee application. Along with the other fee applications in the Milwaukee Road reorganization, the district court referred Rosenstein's application to a special master in bankruptcy.

On November 5, 1985, the special master issued a thirty-eight-page report. While finding that "some" of Rosenstein's work did benefit the estate,[3] the special master recommended that the district court deny Rosenstein's fee application on the basis of

the then-applicable Bankruptcy Rule 8–212(c)(2). The rule provided:

*"No compensation or reimbursement shall be allowed to any* committee, *attorney,* or other person *acting in the case in a representative or fiduciary capacity who,* at any time after assuming to act in such capacity *has,* without approval of the court, *purchased or sold claims against,* or stock of, *the debtor* or beneficial interests, direct or indirect, in such claims or stock, or by whom or for whose account such claims, stock or beneficial interests therein have been otherwise acquired or transferred."

(Emphasis added). In his report, the special master determined that "Rule 8–212 on its face precludes an award to Rosenstein as an attorney if he traded in claims, directly or indirectly, after he commenced acting as an attorney in Stickney in these proceedings in May, 1983." Because "Stickney's purchases of claims after May, 1983, when Rosenstein was the 100% shareholder, were for Rosenstein's benefit individually," the special master reasoned that "the compensation or reimbursement sought is that for an attorney who indirectly purchased, or for whose account there [sic] were purchased, claims against the debtor after the time when such attorney acted as such in the proceedings." Thus, the special master found that Rule 8–212(c)(2) bars attorney Rosenstein's claim for the payment of fees from the debtor's estate.

Additionally, the special master found that even if Rosenstein's purchase and sale of claims against the debtor on behalf of the Stickney Corporation is not proscribed by Rule 8–212(c)(2), Rosenstein's purchase and sale of claims while he acted as a "representative" of other trade creditors forecloses any right he might have to recover fees from the estate. The special master noted that:

"Although Rosenstein testified at one point he did not consider himself a fiduciary or representative of trade creditors

---

11 U.S.C. § 205(c)(12) (1976 ed.) (emphasis added).

**3.** The special master found that "some of [Rosenstein's] services did benefit the estate and the completion of a plan, including a final resolution of the interest rate question without extensive litigation and potential appeals."

generally until settlement discussions commenced in April, 1985, at another point he testified that during the proceedings he was 'the most vocal advocate of the trade creditors,' and that he believes the court 'looked to Stickney Corporation as the spokesman for the trade creditors.' ... Under the circumstances of this case, *where compensation is sought for legal services resulting in a benefit to the estate and to all trade creditors, it would be anomalous to conclude that Stickney's purchasing claims from the very class whose interests were purportedly served at that time did not give rise to a potential clash of interests of the kind the rule seeks to preclude.* Although applicants protest that they did not have inside information or conflict problems, courts have repeatedly held that prophylactic rules such as 8–212 must be applied strictly, even if the result is harsh in cases in inadvertent, *de minimus*, or only technical violations. *Wolf v. Weinstein*, ... 372 U.S. [633] at 654–56 [83 S.Ct. 969, 982–83, 10 L.Ed.2d 33] (that the 'rule occasionally bars compensation to those whose conduct might have been considered inequitable or disloyal ... is not reason to suspend to make selective the operation [thereof].'). *See also In re Midland United Company*, 159 F.2d 340, 345 (3rd Cir.1947) (prohibition applies regardless of whether there is an actual conflict.)" [4]

(Emphasis added).

In his fee application, Rosenstein also argued that because his legal work benefited other trade creditors, the "common-fund" doctrine (an equitable rule requiring those who benefit from an attorney's labors to share in the cost of obtaining those benefits, *see In re NuCorp Energy, Inc.*, 764 F.2d 655, 661 (9th Cir.1985)), entitles him to recover fees from the estate. The special master rejected the application of the common fund doctrine as having "no place in these proceedings" since "application of the doctrine would result in those who benefit (here trade creditors) paying part of the expenses, not in payment by a third-party from whom benefits were exacted. *See, e.g., In re NuCorp Energy, Inc.*, 764 F.2d at 661 (fees paid under the 'fund' theory come out of the fund itself)." However, the special master recommended that should the district court hold that Rule 8–212(c)(2) does not prevent Rosenstein's recovery of fees from the estate, the applicants be awarded $60,000 "as reasonable compensation and reimbursement for services and expenses which benefited the estate and completion of a plan of reorganization, on the condition that $8,000 of that amount be paid to Hurwitz (Rosenstein's associate) as compensation for his services."

On September 10, 1986, the trial judge overruled Rosenstein's objections to the special master's report, and affirmed and adopted the special master's recommendations that: (1) Rule 8–212(c)(2) barred Rosenstein's recovery of fees from the estate due to his purchase and sale of claims against the estate while he acted in a representative capacity in the case; and (2) the common-fund doctrine cannot be invoked to avoid the operation of Rule 8–212. The district court did not address the special master's alternative recommendation. Rosenstein appeals the court's order denying his application for attorney's fees in its entirety.

4. The special master also found that Rosenstein failed to provide a "detailed statement" of claims against the debtor acquired or transferred by the applicant during the case. Rosenstein did not provide such a statement, but only stated briefly in an accompanying affidavit that Stickney had purchased "a number of claims," filed assignments thereof, and "also sold many of the claims." The application failed to disclose Rosenstein's 50% interest in the Stickney Corporation, particularly not as a 50% shareholder after May, 1982 and a 100% shareholder and the president after May, 1983; it merely described Rosenstein as Stickney's attorney. Furthermore, the affidavit supporting the application was less than forthright in stating that after January, 1983, "very few claims were purchased." In fact, trade creditor claims of more than $80,000 face value, 25% of those held by Stickney when the debtor made payment thereon, were purchased after May, 1983. Also, Rosenstein purchased the $225,000 *McDonald* fee claim after May, 1983.

## II.

■ Rosenstein's primary argument on appeal is that the trial court erred in approving the special master's recommendation that his request for the payment of attorney's fees from the estate is barred under former Bankruptcy Rule 8–212(c)(2).[5] Rule 8–212 provided:

"(c) Limitations on allowance . . .

(2) *Denial of allowance. No compensation or reimbursement shall be allowed to any* committee, *attorney,* or other person *acting in the case in a representative or fiduciary capacity who, at any time after assuming to act in such capacity has,* without approval of the court, *purchased or sold claims against,* or stock of, *the debtor* or beneficial interests, direct or indirect, in such claims or stock, or by whom or for whose account such claims, stock or beneficial interests therein have been otherwise acquired or transferred."

(Emphasis added). Under the terms of this rule, no person who acts in a "representative or fiduciary capacity" in the bankruptcy case may recover fees from the estate if he or she buy or sell claims against the debtor while acting in that capacity. The rule was enacted to prevent those with access to inside information or control over a reorganization from misusing their position for private gain. *Wolf v. Weinstein,* 372 U.S. 633, 83 S.Ct. 969, 10 L.Ed.2d 33 (1963).

■ In *Wolf,* the Supreme Court stated that "the purpose behind [Rule 8–212] was . . . to give pervasive effect in Chapter X proceedings to the historical maxim of equity that the fiduciary may not receive compensation for services tainted by disloyalty or conflict of interest. Indeed, we have several times declared that the general statutory authorization in the Bankruptcy Act for reasonable compensation for services 'necessarily implies loyal and disinterested service in the interest of those for whom the claimant purported to act.' " 372 U.S. at 641–42, 83 S.Ct. at 975–76 (citations omitted). The court further explained that the paramount objective of the rule is to check the misuse of one's "strategic position" in a corporate reorganization for private gain:

"*Access to inside information or strategic position in a corporate reorganization renders the temptation to profit by trading in the debtor's stock particularly pernicious.* The particular dangers may take two forms: On the one hand, an insider is in a position to conceal from other stockholders vital information concerning the debtor's financial condition or prospects, which may affect the value of its securities, until after he has reaped a private profit from the use of that information. On the other hand, one who exercises control over a reorganization holds a post which might tempt him to affect or influence corporate policies—even the shaping of the very plan of reorganization—for the benefit of his own security holdings but to the detriment of the debtor's interests and those of its creditors and other interested groups."

*Id.* (emphasis added). We agree with the special master and the district court that Rosenstein's purchase and sale of claims against the debtor during the time he represented Stickney and other trade creditors runs head first into the express terms of

---

**5.** Appellants additionally maintain that Rule 8–212 is not applicable to this proceeding since the new Bankruptcy Rules that became effective August 1, 1983, superseded Rule 8–212. However, their failure to raise the issue in their exceptions to the special master's report waived their right to present it on appeal. *Cf. Video Views, Inc. v. Studio 21 Limited,* 797 F.2d 538, 539–40 (7th Cir.1986) (failure to object to magistrate's report waived all legal issues resolved in the report). Moreover, cases commenced under the 1898 Bankruptcy Act are governed solely under the provisions of that Act. Because this proceeding was commenced in 1977 under the 1898 Bankruptcy Act, neither the Bankruptcy Code of 1978 nor the rules promulgated subsequent thereto apply to this case. *See, e.g., In re Emergency Beacon Corporation,* 48 B.R. 341, 354 (S.D.N.Y.1985) ("the recently promulgated Bankruptcy Rules do not apply to cases filed under the Bankruptcy Act of 1898"); *In re Silverman,* 36 B.R. 254, 257 (Bankruptcy S.D.N.Y. 1984) ("[t]he new rules do not displace the former Bankruptcy Rules as they apply to cases filed under the Act.").

and purposes behind Rule 8–212(c)(2). As summarized in the factual section of this opinion, in the 2.5 year period between January of 1982 and April of 1984, Rosenstein purchased the claims of almost ninety trade creditors at a substantial discount, and sold many of the claims for profit without acquiring court approval. As of the date of his application for attorney's fees, the Stickney Corporation still held approximately $310,000 in claims against the railroad. At this time, Rosenstein owned 100% of Stickney while representing Stickney in the bankruptcy case. Further, since Rosenstein purported to act on behalf of other trade creditors, the special master found that he also acted in a "representative capacity" with respect to those creditors. Thus, because Rosenstein was an "attorney ... acting in the case in a representative ... capacity who at any time after assuming to act in such capacity, has purchased or sold claims against ... the debtor," we agree with the appellees' position that the terms of Rule 8–212(c)(2) prevent him from recovering fees from the estate. *See Wolf v. Weinstein*, 83 S.Ct. at 980–81; 6A Collier on Bankruptcy ¶ 13.18 at 664 (14th ed. 1977); *In re 188 Randolph Building Corp.*, 151 F.2d 357 (7th Cir. 1945), *cert. denied*, 327 U.S. 764, 66 S.Ct. 675, 90 L.Ed. 995 (1946).

Rosenstein argues that he did not "purchase claims against the debtor" for his own benefit and thus did not have a conflict of interest within the meaning of Rule 8–212. Conversely, he asserts that he was merely buying and selling claims on behalf of the Stickney Corporation, a separate entity, not for his own benefit. Our review of the record fails to disclose any support for this assertion. To the contrary, Rosenstein's ownership interests in Stickney gave him a direct and substantial interest in every purchase or sale of trade creditor claims on behalf of Stickney that occurred during the bankruptcy proceedings. For instance, Rosenstein had at least a 25% interest in all claims that Stickney purchased and sold during 1982 and the beginning of 1983, and then a 50% interest in Stickney. And later in 1983, when Rosenstein began to represent Stickney and

the interests of other trade creditors in the reorganization proceedings, he had become Stickney's president, and its sole director and only shareholder. After May, 1983, Rosenstein had a 100% interest in the twelve trade creditor claims that Stickney purchased for $25,000 which had a face value of over $80,000. In light of Rosenstein's direct interest in Stickney's purchase of trade claims against the debtors, (as the president, sole director and shareholder of the Stickney Corporation), we are convinced that Rule 8–212(c)(2) prohibits his recovery of fees from the estate. Case law construing the predecessor to Rule 8–212(c)(2) (Section 249 of the Act, 11 U.S.C. § 649) confirms our conclusion that an attorney may not escape the operation of the rule merely by trading through a business entity or family members. *See, e.g., In re Walchef Development Corp.*, 388 F.Supp. 1064, 1069 (S.D.Cal.1975) (court denied compensation where attorney's law firm traded in the debtor's stock); *In re Midland United Company*, 159 F.2d 340, 345 (3d Cir.1947) (court denied compensation where attorney representing a group of the debtor's investor's purchased an interest in the debtor's subsidiary which had claims against the debtor.)

Rosenstein also challenges the special master's factual finding that he acted in a representative capacity with respect to trade creditors other than Stickney. Since Rosenstein challenges a special master's finding of fact (later adopted by the district court), Federal Rule of Civil Procedure 52(a) necessarily limits our review of this argument to whether the district court's findings were clearly erroneous. *Hughes v. United Airlines*, 829 F.2d 1407 (7th Cir. 1987). Rule 52(a) provides in pertinent part:

"Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses. *The findings of a master, to the extent that the court adopts them, shall be considered as the findings of the court.*"

(Emphasis added). "A finding is clearly erroneous when although there is evidence to support it, the reviewing court, after considering the entire record, is left with the definite and firm conviction that a mistake has been committed." *Hughes,* 829 F.2d at 1416 (citing *Anderson v. City of Bessemer City, North Carolina,* 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985)).

In the case at hand, the record provides ample support for the special master's finding that Rosenstein acted in a representative capacity when he attempted to obtain a higher rate of interest on behalf of trade creditors other than Stickney. For example, the May 9, 1983, retainer agreement that Rosenstein himself drafted acknowledged his intention to work "on behalf of the entire class of trade creditor claimants, ... to obtain additional employment as an attorney for other trade creditors of the Milwaukee Road," and to receive compensation from those creditors. Rosenstein's first pleading in the case, entitled "The Comments of Stickney Corporation" explained that Stickney's "sole reason for participation herein is to seek equitable treatment for the claims of trade creditors." In their fee application before the district court two years later, Stickney and Rosenstein attempted to justify their request for compensation by emphasizing "Stickney's leading role as a representative of the class of trade creditors." Finally, in his trial testimony, Rosenstein repeatedly refers to Stickney's actions "on behalf of the trade creditors." In light of Rosenstein's repeated representations that he acted as a *de facto* representative of trade creditors in his attempt to obtain higher interest rates on their claims, we are not "left with the firm and definite conviction that a mistake has been committed" with respect to the special master's finding of fact. We agree with the special master's findings that Rosenstein acted in a representative capacity during the bankruptcy proceedings with respect to trade creditors other than the Stickney Corporation. Thus, we adopt those findings and hold that Rule 8–212(c)(2) prohibits Rosenstein's collection of fees from the bankruptcy estate.[6]

Rosenstein finally argues that *Wolf* "must not be interpreted rigidly" to bar compensation when the attorney neither has a conflict of interest nor possesses inside information. He notes that at no time was he ever placed in a position of representing conflicting positions, nor did he have access to any information not contained in the public records of the bankruptcy proceedings. Because these dual policies behind Rule 8–212 were not implicated by his conduct, Rosenstein maintains that it would be unfair to deny him compensation on the basis of the rule.

6. Rosenstein additionally maintains that Rule 8–212(c)(2) does not apply to an attorney who represents only one creditor; thus, the rule does not apply to Rosenstein who, he argues, represented only the Stickney Corporation. In addition to being contrary to the special master's factual finding that Rosenstein represented trade creditors other than Stickney, the plain language of Rule 8–212(c)(2) does not support Rosenstein's assertion: "No compensation or reimbursement shall be allowed to any ... attorney ... acting in a representative ... capacity." Moreover, Rosenstein fails to cite any case law to bolster his position. Instead, he contends that Rule 8–212 must be read in conjunction with Rule 8–211(a) which specifically requires that "every person or committee ... representing more than one creditor" file a disclosure statement, to engraft the provisions of the earlier rule onto Rule 8–212. In *Wolf,* the Supreme Court rejected the precise theory that Rosenstein now posits: that the scope of section 249 (the forerunner to Rule 8–212) should be limited by earlier sections in the Code. The court stated:

> "It is significant that the coverage of § 249 is defined in terms quite unlike those of the earlier sections of the Article. While §§ 241–243 and § 247 detail with care the classes of persons to whom compensation is to be allowed and by whom application is to be made, § 249 speaks generally of 'any committee or attorney, or other person acting in the proceedings in a representative or fiduciary capacity....' Had the Congress meant the coverage of this section to be coextensive with that of its predecessors in the Article, it would presumably either have referred expressly to the earlier sections as the guidelines for section 249, or would have enumerated the same groups again in essentially the same terms. That the draftsman of section 249 used neither readily available approach suggests that the superintendence of section 249 was meant to transcend the bounds of the Article."
> 83 S.Ct. at 978.

*Wolf,* however, expressly held that "[i]n light of the seriousness of the abuses which the statute was designed to prevent, it has been thought that to allow any such exception or dispensation would frustrate the manifest intent of Congress to impose an effective prophylactic rule." 83 S.Ct. at 982. Indeed, *Wolf* demonstrates that in order to prevent those who occupy a "strategic position in a corporate reorganization" from abusing that position for his own gain, the rule against trading any claims against the debtor must be construed broadly and applied even where the result may appear harsh. *Id.* at 982–83.

The facts of *Wolf* illustrate this principle. There, two corporate officers of the debtor's business had operated the business efficiently and prosperously during a bankruptcy reorganization despite substantial obstacles, but they had traded in very small amounts of the debtor's stock (involving only about thirty shares) during the bankruptcy proceedings. Despite their apparent good faith and the *de minimus* nature of the infractions, the Court declined to carve out a good-faith exception, and ordered the "restitution of all amounts ... received by these respondents since the start of the reorganization." *Id.* at 982. In so holding, the Court stated that:

> "The lower federal courts have uniformly found it immaterial to the application

of section 249, for example, that the extent of trading may have been minimal; that the applicant may never have realized the profit from the transaction, or may actually have suffered a loss; that the trading may have been done in response to a personal or corporate emergency; or that the applicant may neither have possessed nor attempted to acquire inside information bearing on the value of the debtor's stock.... *That the rule occasionally bars compensation to those whose conduct might not have been considered inequitable or disloyal in the absence of such a statute is no reason to suspend or make selective the operation of the statute's sanctions.*"

83 S.Ct. at 982–83 (emphasis added).

In light of the guidelines set forth in *Wolf,* we find no merit in Rosenstein's argument that his alleged lack of inside information or the absence of an actual conflict of interest should suspend the operation of Rule 8–212(c)(2). Moreover, the purposes behind the rule are not as inapplicable to Rosenstein's situation as he presents. Rosenstein admits that he spent hundreds of hours (for which he seeks compensation) reviewing every document filed in the reorganization proceedings and attending court hearings—regardless of whether or not they concerned trade creditor issues.[7] Both his intimate knowledge

---

7. We take this opportunity to note that Rosenstein's time records documenting his services on behalf of Stickney are so extremely inadequate that the denial of their fee application on this basis alone would be appropriate. Rosenstein billed for over 2,000 hours of legal services (and now requests that we charge his hours to the estate at the rate of $145.00 per hour) performed on behalf of Stickney in pursuit of a higher interest rate. Yet his application for attorney's fees contains almost no information on what he was doing for Stickney during those hours. His only time records consists of a number (presumably reflecting hours) jotted down next to a date on his calendar book; no description of services is given. Rare comments appear in his 1984 calendar noting due dates or appointments, but do not reflect time spent or services performed. Moreover, because Rosenstein was an officer and after 1983 president and sole shareholder of Stickney, it is impossible to determine whether the hours noted on his calendar as spent performing services for Stickney were all performed in pursuit of a higher

interest rate or whether some of the services were performed as part of his responsibilities as an officer/shareholder of Stickney Corporation.

The trustee, who was charged with the task of reviewing all of the fee petitions on behalf of the debtor, stated that he was:

> "Not able to tell from the bare summary time sheets submitted by Rosenstein on behalf of Stickney precisely how much of the time recorded ... was spent on matters related directly to the reorganization in adoption of the plan and how much may have been spent on matters relating to Stickney's active trading in the unsecured claims.... The general assertion of hours gives the trustee no comfort that the asserted time was not commingled with other representations."

The special master likewise concluded, and we agree, that Rosenstein's attempt to reconstruct his time records was completely unavailing, and that "Rosenstein's devotion of more than 2,000 hours of time to this matter in over two years undoubtedly could not be sustained even if adequate time records existed." This excerpt from

of the proceedings as well as his status as the attorney of record enabled him to obtain superior knowledge both about the likelihood and the timing of payments on trade creditor claims, thereby benefiting the business of the Stickney Corporation, whose sole purpose was to speculate on the value of those claims.[8] Thus, Rosenstein's access to this kind of information placed him in the kind of "strategic position" envi-

sioned by *Wolf* as giving rise to the danger of misuse of that position for private gain. In accordance with *Wolf*, we decline Rosenstein's invitation to create an exception to Rule 8–212(c)(2) on his behalf, and hold that his purchase and sale of claims against the debtor while he acted in a representative capacity in the bankruptcy reorganization bars him from recovering fees from the estate.[9]

---

the special master's report highlights some of the major problems:

"In summary, from May, 1983 through July, 1985, Rosenstein filed three pleadings or briefs with the ICC totaling twelve pages and setting arguments as to the interest rate; and filed or prepared twelve pleadings or briefs with the reorganization court totaling sixty-eight pages and setting forth arguments as to the interest rate and date of payment. Rosenstein was unable to state how many of his 2,109 total hours of work (about 50% of all of his work as an attorney during this time period) were devoted to preparing and making these filings. The other work done by Rosenstein primarily consisted of reviewing all filings in the case, attending court sessions, and communications with counsel. In this regard, on at least twenty-five occasions, Rosenstein appeared in court, usually at the regular Monday sessions, but did not address the court. On several of these occasions, they were not court sessions at which any other attorney for a creditor appeared. Rosenstein testified that from July, 1984 to June, 1985, he in part attended court sessions 'to at least remind the judge that there is somebody out there waiting for something to happen [with respect to trade creditor claims]. *I would sit intentionally at the front chair so the judge would see me. I would look as unhappy as I could possibly look.'*"

(Emphasis added). It is beyond question that an attorney applying for fees under any fees statute has an obligation to provide accurate and detailed records for the services for which he or she claims reimbursement. *In Re Central Ice Cream Co.,* 836 F.2d 1068 (7th Cir.1987) (a district court reviewing a fee petition does not have to "wade through ... voluminous records to rescue compensable time from the sea of non-compensable hours."). Rosenstein has failed miserably in attempting to meet this obligation. We are convinced that no client in an arms-length relationship with Rosenstein would have paid him $145.00 per hour to sit silently for days in the front of a courtroom looking unhappy, nor would a client agree to pay a $340,000 fee on the basis of Rosenstein's time records. If a business client would not agree to pay Rosenstein's fee, neither should the estate in bankruptcy be charged with the incredibly inflated fee he now requests. The shoddy record-keeping exhibited by Rosenstein involves pre-

cisely the kind of abuse of the bankruptcy system that the rules regarding the reasonableness of attorney's fees are intended to prevent. We would therefore deny his fee petition on this basis alone. *See, e.g., Brown v. Stackler,* 612 F.2d 1057, 1059 (7th Cir.1980).

8. Although much of the information Rosenstein obtained was contained in the public records, in a practical sense a great deal of information concerning the railroad's ability to pay trade creditor claims might very well have been transmitted informally between attorneys and corporate insiders. Further, many other trade creditors who had comparatively small claims and did not have the resources to review the mountains of filings and attend all the hearings involved in the reorganization, and hence did not have the same access to information as Rosenstein and Stickney. For example, as appellees point out, the claims Rosenstein purchased after he became active in the proceedings in May 1983, ranged from $1,500 to $18,800 in face value. Rosenstein purchased each of these claims at an average price of less than $.32 on the dollar after he had learned that the trustee's proposed plan of reorganization provided for the full payment of trade creditors claims, with interest.

9. Although unnecessary to our decision, we also agree with the special master's recommendation that the "common-fund" doctrine does not operate to authorize the payment of fees or costs *from the bankruptcy estate.* In *Holbrook v. Pitt,* 748 F.2d 1168 (7th Cir.1984), we explain the crucial distinction between an application seeking the payment of attorneys fees from a *fund* created by an attorney's legal services, and an application seeking payment from the *opposing party:*

"The difference in the two concepts was recently recognized in the opinion for the Ninth Circuit on attorney's fees last year (*McQuiston v. Marsh,* 707 F.2d 1082, 1085 [9th Cir.1983]): 'First, the common benefit theory fails because McQuiston is seeking an award from the opposing party, not from a common fund.'"

748 F.2d at 1174. The Supreme Court explained the basis for the common fund doctrine in *Boeing Company v. Van Gemert,* 444 U.S. 472, 478–81, 100 S.Ct. 745, 749–50, 62 L.Ed.2d 676 (1980) (emphasis added):

For the foregoing reasons, the district court's adoption of the special master's recommendation to deny the appellant's application for attorney's fees is AFFIRMED.

"[T]his court has recognized consistently that a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney fee *from the fund as a whole....* The common-fund doctrine reflects the traditional practice in courts of equity, ... and it stands as a well-recognized exception to the general principle that requires every litigant to bear his own attorney's fees.... The doctrine rests on the perception that persons who obtain the benefit of a lawsuit without contributing to its costs are unjustly enriched at the successful litigant's expense.... Jurisdiction over the fund involved in the litigation allows a court to prevent this inequity by assessing attorney's fees *against the entire fund,* thus spreading fees proportionately among those benefited by the suit.... The common-fund doctrine, as applied in this case, is entirely consistent with the American rule against taxing the losing party with the victor's attorney's fees.... The district court's judgment assesses attorney's fees against a fund awarded to the prevailing class."

Rosenstein's attempt to recover fees from the estate under this doctrine is clearly misplaced. At best, the doctrine may allow him to recover fees *from the fund* created on behalf of other trade creditors when he succeeded in negotiating a higher rate of interest on trade creditor claims. In any event, even assuming *arguendo* that the common fund doctrine authorized the payment of fees from the estate, Rule 8–212 nevertheless would prevent the payment of fees to an attorney who trades in claims against the estate while acting in a representative capacity in the bankruptcy proceedings.